David Noonan, *Pro Hac Vice* (*MA Bar No. 373260)
**LAW OFFICE OF DAVID J. NOONAN**
32 Tanglewood Road
Amherst, Massachusetts, 01002
(413) 549-5491
noonan@law-djn.com

Gary N. Lento (028749)
**RADIX LAW**
15205 N. Kierland Blvd., Suite 200
Scottsdale, Arizona 85254
(602) 606-9300
lento@radixlaw.com

*Attorneys for Plaintiff FAVORITE HEALTHCARE STAFFING, LLC*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Favorite Healthcare Staffing, LLC, a Kansas limited liability company, | Case No.: 2:23-cv-01810-DJH |
| Plaintiff, | **AMENDED COMPLAINT** |
| vs. | |
| IASIS Healthcare Holdings, Inc., St. Lukes Medical Center, L.P., and Mountain Vista Medical Center, L.P., | (Assigned to the Honorable Diane J. Humetewa) |
| Corporate Defendants, | |
| and | |
| Ralph de la Torre; Michael Callum; and Christopher Dunleavy; | |
| Individual Defendants. | |

1539601.1

## **INTRODUCTION**

1.    The Plaintiff, pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, amends its complaint as a matter of course. Defendants have yet to file a response to the original complaint.

2.    Plaintiff brings this action against the Defendants in order to collect damages for monies owed for (i) the Corporate Defendants' breach of an employment agency service contract for temporary health care professional services rendered to the Corporate Defendants, (ii) the recovery of the quantum meruit value of said employment agency services delivered and received to said Corporate Defendants, (iii) the recovery of that amount of distributions paid by the Corporate Defendants to the principals of the Corporate Defendants or alternatively to the principals of that corporate entity into which Corporate Defendants' distributions were paid during the period of time the Corporate Defendants were unable to pay their debt obligations to Plaintiff, (iv) pursuant to applicable Delaware and/or Arizona law, the recovery of Plaintiff's reasonable fees and expenses incurred as a result of Corporate Defendants' breach of contract which necessitated Plaintiff instituting this civil action; (v) the recovery of that amount of distributions fraudulently conveyed by the Corporate Defendants to the principals of each Corporate Defendant or alternatively to the principals of that corporate entity into which Corporate Defendants' distributions were paid during the period of time the Corporate Defendants were unable to pay their debt obligations to Plaintiff, (vi) pursuant to Rule 64 and 65 of the Federal Rules of Civil Procedure injunctive relief preventing and restraining the Corporate Defendants from making any additional distributions to any person or entity during the pendency of this civil action, and (vii) pursuant to Ariz. Rev. Stat. § 12-1521 the issuance of attachments to and in all of the personal property of the Corporate Defendants.

## **PARTIES**

3.    FAVORITE HEALTHCARE STAFFING, LLC. f/n/a Favorite Healthcare Staffing, Inc. ("Plaintiff" and/or "Favorite Healthcare") is a corporation duly organized and operating pursuant to the laws of the State of Kansas with a principal place of business in

1539601.1

Overland Park, Kansas and is in the business of providing qualified temporary health care personnel to hospitals, nursing homes, rest homes and other medical facilities throughout the United States. Pursuant to Favorite Healthcare's standard terms and conditions of service contracting parties have the option to transform temporary healthcare professionals provided by Favorite Healthcare to permanent employees of the contracting party upon the payment of specified employment agency fees.

4. Defendant, IASIS HEALTHCARE HOLDINGS, INC. ("IASIS") is a corporation duly organized and operating pursuant to the laws of the State of Delaware and registered to do business in Arizona as a foreign for-profit corporation. Its current principal place of business in Arizona is located at 555 N.18th Street, Suite 100, Phoenix, AZ and is in the business of providing nursing home care to patients. IASIS is the general partner to Defendant, St. Luke's Medical Center, L.P., and Defendant, Mountain Vista Medical Center, L.P.

5. Defendant, ST. LUKE'S MEDICAL CENTER, L.P. ("St. Lukes") is, a foreign limited partnership, registered to do business in Arizona with Defendant IASIS as its general partner and rendered medical services at its facility in Tempe, Arizona.

6. Defendant, MOUNTAIN VISTA MEDICAL CENTER, L.P. ("Mountain Vista") is, a foreign limited partnership, registered to do business in Arizona with Defendant IASIS as its general partner and rendered medical services at its facilities in Florence and Mesa, Arizona. (Defendants IASIS, St. Lukes, and Mountain Vista are sometimes hereinafter referred to collectively as "Corporate Defendants").

7. Defendant RALPH DE LA TORRE is the President and one of the directors of IASIS Healthcare Holdings, Inc. and upon information and belief is either an equity owner of the Corporate Defendants or alternatively an equity owner of that entity into which distributions from IASIS are made.

8. Defendant MICHAEL CALLUM is a director of IASIS Healthcare Holdings, Inc. and upon information and belief is either an equity owner of the Corporate Defendants or alternatively an equity owner of that entity into which distributions from IASIS are made.

9.     Defendant CHRISTOPHER DUNLEAVY is a treasurer of IASIS Healthcare Holdings, Inc. and upon information and belief is either an equity owner of the Corporate Defendants or alternatively an equity owner of that entity into which distributions from IASIS are made (Defendant, Ralph de la Torre Defendant, Defendant Michael Callum, and Defendant, Michael Callum are sometimes hereinafter referred to collectively as "Individual Defendants").

## JURISDICTION

10.    This matter involves damages in excess of $75,000.00, exclusive of interest and costs, arising from a dispute between citizens of different states. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1332.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because this lawsuit concerns parties that manage/own/service a business providing nursing home care to residents of this District, conduct business in this District, and because a substantial part of the events or omissions giving rise to the claims herein occurred in this District. The parties therefore have sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

## FACTUAL ALLEGATIONS

12.     In September 2015 IASIS, in its capacity as a general partner of various medical facilities, entered into an agreement through which Favorite Healthcare would provide temporary healthcare professionals to certain limited partners of IASIS. ("Staffing Agreement"). A copy of said Staffing Agreement is attached hereto and marked as **Exhibit "A"**. Said Staffing Agreement was amended by the parties on 4 subsequent occasions namely February 3, 2018, September 14, 2018, August 1, 2020, and December 4, 2021. ("Amendments") A copy of said Amendments to the Staffing Agreement is attached hereto and marked as **Exhibit "B"**. All of the Corporate Defendants acknowledged and/or were bound by the terms and conditions of **Exhibit "A"** and **Exhibit "B"**.

13.    Pursuant to the terms and conditions of **Exhibit "A"** and **Exhibit "B"** Favorite Healthcare, between December 2021 and February 2022, provided temporary health care

professionals to St. Luke's and Mountain Vista at 3 different facilities located in Mesa, Tempe and Florence, Arizona. Favorite Healthcare submitted numerous invoices to the Corporate Defendants between January 2021 and February 2022 of which the Corporate Defendants have paid only 5 and failed, refused, and neglected to pay the remainder. The temporary healthcare professional services provided by Favorite Healthcare to St. Luke's, Mountain Vista and IASIS were accepted by the Corporate Defendants and materially benefited the Corporate Defendants and their owners/shareholders.

14.     Favorite Healthcare tendered invoices requesting payment for services rendered to the Corporate Defendants for the period December 2021 through February 10, 2022, totaling $372,843.65 plus accrued interest thereon. On July 28, 2022, Favorite Healthcare, through legal counsel, made a written demand for payment of the Balance Due. Said demand was sent by FedEx and proof of receipt has been confirmed. In response to said demand IASIS tendered a payment in the amount of $22,700.00 but Defendants IASIS, St. Luke's and Mountain Vista have otherwise failed, refused and/or neglected to make any additional payments on any of said invoices. There remains due and owing to Favorite Healthcare an outstanding balance of $350,116.45 ("Balance Due") plus interest thereon and attorney's fees. A summary of the invoices tendered to Defendant is attached hereto and marked as **Exhibit "C".**

15.     The Corporate Defendants' acceptance of Favorite Healthcare's provision of temporary healthcare professionals, their receipt and execution of the Amendments, the receipt of invoices for more than 14 months and their $22,700.00 partial payment, are all admissions of fact that the Corporate Defendants have expressly and/or impliedly agreed to the terms and conditions contained in Exhibit "A" and "B" and Favorite Healthcare's standard terms and conditions of service. Pursuant to the terms and conditions contained in Exhibit "B", Plaintiff is provided the right to collect the reasonable cost of collection, including but not limited to, its attorney's fees. Corporate Defendants' intentional breach of contract has caused the Plaintiff to institute this civil action to collect the Balance Due.

/ / /

1539601.1

16.     The Corporate Defendants and their equity holders have received, accepted, and benefited from Favorite Healthcare's provision of temporary healthcare professionals without paying the fair market value for said services. The reasonable value of the services rendered to and accepted by Corporate Defendants is $350,116.45. Despite demand, the Corporate Defendants have failed to pay to the Plaintiff the reasonable value of the services rendered to and accepted by the Corporate Defendants, were materially benefited and as a result the Corporate Defendants have been unjustly enriched.

17.     None of the Corporate Defendants nor the Individual Defendants have raised any defense, claim of setoff, breaches of warranty or any counterclaims to Favorite Healthcare's assertion that it is owed the Balance Due.

18.     Upon information and belief, the Corporate Defendants were intentionally undercapitalized, had assets siphoned off through illegal distributions and were unable to pay their debts as they were due. The facts set forth herein and in paragraphs 14, 15, 16 and 17 herein is evidence that the Corporate Defendants intended to use the corporate entity as a vehicle to commit fraud as against Plaintiff and avoid contractual responsibility to Plaintiff.

19.     Upon information and belief IASIS, in its capacity as the general partner, has caused the issuance of corporate distributions to the Corporate Defendants' owners/shareholders during a period of time that all of the Corporate Defendants were unable to pay their just debts to Plaintiff in violation of Arizona Rev. Stat § 10-640 (2015) and the applicable law, 8 Del. C. § 170(a), of the state of its incorporation. The Corporate Defendants did not receive fair and/or reasonably equivalent value from the recipients of the illegal distributions either at the time of distribution and/or subsequent to recipient's receipt of distributions and as a result said transfers were fraudulent as to existing creditors such as Favorite Healthcare pursuant to A.R.S. §§ 44-1001 – 44-1010.

## COUNT I

### (Breach of Contract v. IASIS)

20.     Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 19 above.

1539601.1

21.     Plaintiff has performed all duties and obligations under its contract with IASIS except those duties that may have been excused by IASIS's breaches or the conduct of others.

22.     IASIS, by failing to pay the Plaintiff $350,116.45, has breached the terms and conditions of both the invoices tendered and the contract provisions contained in **Exhibits "A" and "B"**.

23.     As a result of said breach, IASIS owes the Plaintiff $350,116.45, and accrued prejudgment interest pursuant to A.R.S. § 44-1201 and attorney's fees pursuant to ARS §12.341.01 and/or 6 Del. C. § 4344 in an amount to be established at trial of this matter.

## COUNT II

### (Breach of Contract v. St. Lukes)

24.     Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 23 above.

25.     Plaintiff has performed all duties and obligations under its contract with St. Lukes except those duties that may have been excused by St. Luke's breaches or the conduct of others.

26.     St. Luke's by failing to pay the Plaintiff $350,116.45 has breached the terms and conditions of both the invoices tendered and the contract provisions contained in **Exhibits "A" & "B"**.

27.     As a result of said breach of contract, St. Luke's owes the Plaintiff $350,116.45 and accrued prejudgment interest pursuant to A.R.S. § 44-1201 and attorney's fees pursuant to ARS §12.341.01 and/or 6 Del. C. § 4344 in an amount to be established at trial of this matter.

## COUNT III

### (Breach of Contract v. Mountain Vista)

28.     Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 27 above.

/ / /

/ / /

1539601.1

29.     Plaintiff has performed all duties and obligations under its contract with Mountain Vista except those duties that may have been excused by Mountain Vista's breaches or the conduct of others.

30.     Mountain Vista by failing to pay the Plaintiff $350,116.45 has breached the terms and conditions of both the invoices tendered and the contract provisions contained in **Exhibits "A" & "B"**.

31.     As a result of said breach of contract, Mountain Vista owes the Plaintiff $350,116.45 and accrued prejudgment interest pursuant to A.R.S. § 44-1201 and attorney's fees pursuant to ARS §12.341.01 and/or 6 Del. C. § 4344 in an amount to be established at trial of this matter.

## <u>COUNT IV</u>

### **(Quantum Meruit – St. Lukes)**

32.     Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 31, above.

33.     St. Luke's requested and received healthcare staffing services from Plaintiff that benefited St. Lukes.

34.     Despite demand, St. Luke's has failed to pay for the healthcare staffing services provided by Plaintiff.

35.     The reasonable value of the staffing services provided to and accepted by St. Luke's is equal to or in excess of $116,711.50.

36.     As a result of the Plaintiff's provision of employment agency services to St. Lukes, St. Luke's has received a material benefit, has been unjustly enriched and is obligated to Plaintiff in the amount of $116,711.50.

## <u>COUNT V</u>

### **(Quantum Meruit – Mountain Vista)**

37.     Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 36, above.

/ / /

1539601.1

38.     Mountain Vista requested and received healthcare staffing services from Plaintiff that benefited Mountain Vista.

39.     Despite demand, Mountain Vista has failed to pay for the healthcare staffing services provided by Plaintiff.

40.     The reasonable value of the staffing services provided to and accepted by Mountain Vista is equal to or in excess of $256,104.95.

41.     As a result of the Plaintiff's provision of employment agency services to Mountain Vista, Mountain Vista has received a material benefit, has been unjustly enriched and is obligated to Plaintiff in the amount of $256,104.95.

## COUNT VI

**(Recovering from Individual Defendants or Alternatively the Principals of the Corporate Entity that Received Distributions from IASIS in Violation of Delaware and Arizona Law)**

42.     Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 41, above.

43.     Delaware General Corporate Law § 170 (a)(2) and 174 8 Del. C. § 170(a), and A.R.S. § 10-640(c) provide that distributions made by a corporate entity that renders the corporate entity unable to pay its debts or alternatively reduces the value of its assets below the amount of its liabilities to be illegal.

44.     Upon information and belief, the Individual Defendants and/or the presently unknown Principals of the Corporate Defendants received payments from IASIS and/or St. Luke's and/or Mountain Vista that were not taxable wages and therefore constitute distributions. Said distributions should be recovered from the Individual Defendants and/or presently unknown Principals of the Corporate Defendants and segregated and held in trust so that the same may be used to satisfy the Corporate Defendants' obligation to Plaintiff for the Balance Due.

/ / /

/ / /

1539601.1

<b><u>COUNT VII</u></b>

<b>(Recovery of Fees & Costs from Corporate Defendants)</b>

45.     Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 44 above.

46.     At all times pertinent hereto, each of the Corporate Defendants have breached the terms of the expressed and/or implied contract between Plaintiff and the Corporate Defendants and have caused the Plaintiff to institute this civil action to collect the Balance Due.

47.     Plaintiff is entitled to recover its reasonable expenses of litigation, including its attorney's fees pursuant to Delaware Code Title VI, Chapter 43 §4344 and/or A.R.S. § 12-341.01.

<b><u>COUNT VIII</u></b>

<b>(Recovery of Fraudulent Conveyances from Corporate Defendants and Individual Defendants)</b>

48.     Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 47 above.

49.     Delaware General Corporate Law § 170 (a)(2) and 174 8 Del. C. § 170(a), and A.R.S. § 10-640(c) provide that distributions made by a corporate entity that render the corporate entity unable to pay its debts or alternatively reduces the value of its assets below the amount of its liabilities to be illegal.

50.     Each of the Corporate Defendants who made distributions to shareholders/homeowners did not receive fair and/or reasonably equivalent value from the recipients of the illegal distributions at the time of and/or subsequent to recipient's receipt of distributions and as a result said transfers were fraudulent as to existing creditors such as Favorite Healthcare.

51.     A.R.S. §§ 44-1001 – 44-1010 provides for the avoidance of transfers which are void or voidable as against creditors. A.R.S. § 44 – 1211 provides that said persons causing said fraudulent transfers with intent to defraud are guilty of a class II misdemeanor.

1539601.1

52.     Plaintiff seeks an order avoiding and ordering the repayment to the appropriate Corporate Defendant(s) of all distributions and payments to their equity holders that constitute fraudulent conveyances distributions to recipients. Said distributions should be recovered from the Individual Defendants and presently unknown Principals of the Corporate Defendants as fraudulent conveyances and segregated and held in trust so that the same may be used to satisfy the Corporate Defendants' obligations to Plaintiff for the Balance Due.

**COUNT IX**

**(Request for Injunctive Relief v Corporate Defendants)**

53.     Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 52 above.

54.     The Corporate Defendants' prior issuance of illegal distributions to its owners/shareholders were intentional and intended to divert assets from the reach of their creditors. By and through this count, Plaintiff seeks to prevent future illegal distributions from any of the Corporate Defendants.

55.     Pursuant to Rule 64 and 65 of the Federal Rules of Civil Procedure Plaintiff seeks the issuance of an order enjoining, preventing, and restraining the Corporate Defendants from making any additional distributions to any person or entity during the pendency of this civil action.

**COUNT X**

**(Application for Issuance of Attachments v Corporate Defendant)**

56.     Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 55 above.

57.     The Plaintiff has filed this action for, inter alia, breach of contract and the payment of money. Plaintiff has no security interest in any assets of the Corporate Defendants. The Corporate Defendants have previously disposed of their property through illegal distributions and the Defendant Corporations are foreign entities/corporations.

58.     Pursuant to A.R.S. §§ 12-1521, *et seq*., and 12-2401, *et seq*., Plaintiff is entitled to and hereby seeks a writ of attachment to any and all the Corporate Defendants' personal

1539601.1

property wherever situated. In support of said application Plaintiff will file an affidavit satisfying the requirements of A.R.S. §§ 12-1521, *et seq*., and 12-2401, *et seq*.

### PRAYERS FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully prays that:

1)      Pursuant to <u>Count I</u>, this Court enter Judgment against the Corporate Defendant in the amount of $350,116.45 plus pre-judgment interest equal to one per cent plus the prime rate as published by the board of governors of the federal reserve system in statistical release H.15 on the date that the judgment is entered pursuant to A.R.S. § 44-1201 or applicable Delaware law, plus attorney's fees as provided pursuant to  A.R.S. § 12-341.01 or the Delaware Code Title VI, Chapter 43 §4344 and costs, and that execution or other appropriate process issue for the enforcement of same; and

2)      Pursuant to <u>Count II</u>, this Court enter Judgment against St. Luke's in the amount of $350,116.45 plus pre-judgment interest equal to one per cent plus the prime rate as published by the board of governors of the federal reserve system in statistical release H.15 on the date that the judgment is entered pursuant to A.R.S. § 44-1201 or applicable Delaware law, plus attorney's fees as provided pursuant to  A.R.S. § 12-341.01 or the Delaware Code Title VI, Chapter 43 §4344 and costs, and that execution or other appropriate process issue for the enforcement of same; and

3)      Pursuant to <u>Count III</u>, this Court enter Judgment against Mountain Vista in the amount of $350,116.45 plus pre-judgment interest equal to one per cent plus the prime rate plus pre-judgment interest equal to one per cent plus the prime rate as published by the board of governors of the federal reserve system in statistical release H.15 on the date that the judgment is entered pursuant to A.R.S. § 44-1201 or applicable Delaware law, plus attorney's fees as provided pursuant to  A.R.S. § 12-341.01 or the Delaware Code Title VI, Chapter 43 §4344, and costs and that execution or other appropriate process issue for the enforcement of same; and

/ / /

/ / /

1539601.1

4)      Pursuant to <u>Count IV</u>, this Court enter Judgment against St. Luke's in the amount of $116,711.50 for the unjust enrichment it received at the expense of the Plaintiff and that execution or other appropriate process issue for the enforcement of same; and

5)      Pursuant to <u>Count V</u>, this Court enter Judgment against Mountain Vista in the amount of $256,104,95 for the unjust enrichment it received at the expense of the Plaintiff and that execution or other appropriate process issue for the enforcement of same; and

6)      Pursuant to <u>Count VI</u>, this Court enter Judgment against the Individual Defendants and the principals of the Corporate Defendants in an amount equal to the amount of illegal distributions made by the Corporate Defendants, that the same be segregated for payment to the Plaintiff and that execution or other appropriate process issue for the enforcement of same; and

7)      Pursuant to <u>Count VII</u>, this Court enter Judgment as against all the Defendants in the amount of Plaintiff's reasonable expenses of litigation, including its attorney's fees pursuant to Exhibit "A", Delaware Code Title VI, Chapter 43 §4344 and A.R.S. § 12-341.01 and that execution or other appropriate process issue for the enforcement of same; and

8)      Pursuant to <u>Count VIII</u>, this Court enter Judgment as against all Defendants avoiding all distributions determined to be fraudulently conveyed pursuant to Delaware and/or Arizona law and order that the same be held in trust for Plaintiff in order to pay the Balance Due and that execution or other appropriate process issue for the enforcement of same; and

9)      Pursuant to <u>Count IX,</u> this Court enter an order preventing and restraining the Corporate Defendants from making any additional distributions to any person or entity during the pendency of this civil action and that execution or other appropriate process issue for the enforcement of same; and

10)     Pursuant to <u>Count X,</u> and Ariz. Rev. Stat. § 12-1521 this Court issue a writ of attachment to and in all of the personal property of the Corporate Defendants and that execution or other appropriate process issue for the enforcement of same; and

11)     For any such other and further relief as this Court deems just and proper.

/ / /

1539601.1

DATED:      October 31, 2023

**RADIX LAW**

*/s/ Gary N. Lento*
Gary N. Lento
15205 N. Kierland Blvd., Suite 200
Scottsdale, Arizona 85254
(602) 606-9300
lento@radixlaw.com

David Noonan, *Pro Hac Vice*\*
**LAW OFFICE OF DAVID J. NOONAN**
32 Tanglewood Road
Amherst, Massachusetts, 01002
noonan@law-djn.com
*Attorneys for Plaintiff FAVORITE HEALTHCARE STAFFING, LLC*

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1539601.1

1

## <u>CERTIFICATE OF SERVICE</u>

2

   I hereby certify that on October 31, 2023, I electronically transmitted the foregoing

3

document and any attachments to the Clerk of the U.S. District Court for the District of

4

Arizona using the CM/ECF System for filing and a transmittal of a Notice of Electronic Filing

5

was sent to the CM/ECF registered participants as listed below.

6

7
                        Brendan Melander, Esq.
                         Brandon Stein, Esq.
8
                       **HUSCH BLACKWELL LLP**
                     2415 E. Camelback Road, Suite 500
9
                          Phoenix, Arizona 85016
10
                   Brendan.Melander@huschblackwell.com
                    Brandon.Stein@huschblackwell.com
11
                        *Attorneys for Defendants*

12

13

   Defendants St. Luke's Medical Center, L.P. and Mountain Vista Medical Center, L.P.

14

will be served in the normal course.

15

16
By: */s/ Gary N. Lento*
17
Gary N. Lento

18

19

20

21

22

23

24

25

26

27

28

1539601.1

# EXHIBIT "A"

## PERSONNEL SERVICE AND INDEMNITY AGREEMENT
### Supplemental Staffing Agreement – Per Diem

**THIS AGREEMENT** is entered into this 15th day of September, 2015, by and between IASIS Healthcare Holdings, Inc., a Delaware corporation, in its capacity as general partner of the following entities: St. Luke's Medical Center, LP d/b/a St. Luke's Medical Center and d/b/a Tempe St. Luke's Hospital, a campus of St. Luke's Medical Center; St. Luke's Behavioral Hospital, LP; and Mountain Vista Medical Center, LP (collectively hereinafter "Hospital") and Favorite Healthcare Staffing, Inc. (hereinafter "Agency").

WHEREAS, Hospital is duly licensed to operate an acute care general hospital in Arizona (the "State")

WHEREAS, Agency is duly licensed in the state of Arizona; and

WHEREAS, Hospital desires to have Agency provide specific services during the term of this Agreement; and

WHEREAS, Hospital and Agency desire to provide a full statement of their respective rights, obligations, and duties in connection with the performance of the Agency's duties hereunder;

NOW THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, the parties agree as follows:

I.    **AGENCY'S SERVICES:**

A.    Agency shall provide Health Professionals requested by Hospital (Registered Nurses, Licensed Practical/Vocational Nurses and Nursing Assistants, etc., (hereinafter ("Professional(s)")) including all requests for weekend/holiday staffing.  The Hospital shall not have any obligation to use Agency for any minimum number of shifts.

B.    Agency shall perform the services required hereunder in accordance with:

    1.    All applicable federal, state, and local laws, rules and regulations;

    2.    All applicable standards of the Hospital's accreditation organizations and state/federal regulatory agencies; and

    3.    All appropriate federal and state licenses and certifications which are required in order for Agency to perform the services required of Agency under this Agreement;

    4.    Agency and any Agency Professionals have, and shall maintain throughout the term of this Agreement, and all appropriate licenses and certifications in the State and any medical or Allied Health Professional staff privileges at Hospital required in order for said Professionals to perform the functions assigned to him or her by Agency in connection with Agency's provision of services to Hospital.

    5.    Agency shall comply with all applicable provisions of law relating to the licensing and regulation of agencies.

    6.    Agency is an Equal Opportunity Employer.  Agency will not discriminate in the placement of Professional on the basis of race, creed, color, national origin, sex, age, disability, citizenship, or veteran status.

    7.    Agency shall comply with all federal laws, regulations, and procedures regarding legal status to work and reside in the U.S., including completion of required Immigration and Naturalization forms upon hire.

II.   **PROFESSIONAL QUALIFICATIONS:**

All Professionals supplied by Agency shall be appropriately licensed in the State and screened in accordance with the policies and procedures consistent with Standards for Nursing Services as set forth by the Hospital's accreditation organizations and state/federal regulatory agencies, and the Guidelines for Use of Supplemental Nursing Services as published by the American Nurses Association Commission on Nursing Services. These specific professional qualifications and policies and procedures for nursing professionals are described in Attachment I to this agreement, which is attached hereto and incorporated herein. Hospital will be provided with employment information on each Professional prior to commencement of the Assignment, including a completed employment application, assessment of skills inventory and references. Each Professional referred shall possess a minimum of one (1) year of full-time experience in an acute care general hospital. Each Professional referred shall possess a current CPR certificate and shall present said certificate to Hospital upon request at any time after commencement of Assignment. Agency will provide a national criminal background check for the past seven (7) years on each employee prior to assignment start date. Agency will provide a seven (7)-panel drug screen done within three (3) months of start date on each employee prior to assignment start date. Each Professional referred for a specialized area of the hospital shall possess the requisite certification for that specialty (i.e., critical care certification).

III.   **COMPENSATION:**

A.    Attached hereto as Addendum A is a fee schedule provided by Agency to Hospital for services provided hereunder. All invoices shall clearly identify the services rendered. Invoices shall be made weekly and Hospital agrees to pay invoices within forty-five (45) days of receipt.

B.    Agency shall provide Hospital its institutional sign-in sheet that all Professionals assigned to Hospital must sign in order to be paid. Agency invoices must be submitted to the Hospital within ninety (90) days of the shift date to be considered for payment. All invoices received after ninety (90) days will be considered null and void.

C.    A pre-designated Hospital representative and the assigned Professional shall approve, by execution, time records on a form provided by Contractor.

IV.   **LEGISLATIVE LIMITATIONS:**

In the event Medicare, Medicaid, or any third party payor, or any other Federal, State, or local law, rules regulations, or interpretations at any time change the method or amount of reimbursement or payment for services under this Agreement, then the parties agree to negotiate in good faith to amend this Agreement. If this Agreement is not amended prior to the effective date of such rule, regulation or interpretation, this Agreement shall terminate as of such effective date.

V.   **TERM AND TERMINATION:**

A.    This Agreement shall remain in effect for a term of three (3) year(s) beginning September 15, 2015, and ending at midnight September 14, 2018, unless otherwise terminated as provided herein.

B.    Either party may terminate this Agreement without cause upon sixty (60) days' written notice to the other party.

C.    Hospital may immediately terminate this Agreement in the event Agency:  1) fails to perform services required hereunder in accordance with appropriate standards of quality; or 2) fails to comply with any of the terms and conditions of this Agreement, or the written policies and procedures of the Hospital as may be in effect from time to time after being given notice of such failure to comply.

D.   Hospital may terminate the services of any Professional immediately for cause upon written notice to Agency as determined by Hospital at Hospital's sole discretion.  Cause is defined as any violation of Hospital policies, insubordination, poor attendance, poor performance, misconduct of any violation of drug abuse policy or any act or omission by the Professional which has an adverse impact on the hospital.

VI.   **INDEPENDENT CONTRACTOR:**

Agency is performing the services and duties required hereunder as an independent contractor and not as an employee, agent, partner of, or joint venture with Hospital.  Neither Agency nor Hospital shall act on behalf of the other, take any action on behalf of the other, nor hold itself out as the agent of the other.  All Professionals assigned to Hospital pursuant to this Agreement shall, for all purposes under this Agreement, be considered employees of Agency only.   Agency shall assume sole and exclusive responsibility for the payment of wages to Professional for services performed by them at Hospital.  Agency shall with respect to said Professional, be responsible for withholding federal and state income taxes, paying Federal Social Security taxes and maintaining unemployment insurance, and maintaining workers' compensation in an amount and under such terms as required by the applicable State Labor Code.

VII.   **INSURANCE AND INDEMNIFCATION:**

A.   Agency will procure and maintain in effect during the term of this Agreement, appropriate insurance coverage as set forth in Section VII.D. below and shall provide the Hospital with current certificates of insurance as evidence. It is further agreed that such policies shall provide primary coverage for Hospital, with a duty to defend.

B.   AGENCY TO INDEMNIFY HOSPITAL: TO THE FULLEST EXTENT PERMITTED BY LAW, AGENCY HEREBY AGREES TO DEFEND, HOLD HARMLESS, AND INDEMNIFY UNCONDITIONALLY HOSPITAL FROM AND AGAINST ANY AND ALL LIABILITY, COSTS, FINES, LOSSES, DAMAGES, CLAIMS, OR CAUSES OF ACTION, AND EXPENSES CONNECTED THEREWITH (INCLUDING REASONABLE ATTORNEY'S FEES) CAUSED, DIRECTLY OR INDIRECTLY, BY, AS A RESULT OF, OR ARISING OUT OF ANY NEGLIGENT ACT OR OMISSION OF AGENCY, ITS EMPLOYEES, AND/OR AGENCY PROFESSIONALS. THIS INDEMNIFICATION IS EFFECTIVE WHETHER OR NOT IT IS ALLEGED THAT HOSPITAL IS NEGLIGENT OR GROSSLY NEGLIGENT.

C.   Agency shall provide Hospital with documentation of current Certificate of Insurance with Hospital and IASIS named as additional insured in a form satisfactory to Hospital that establishes that Agency has in effect current Professional Liability and Workers' Compensation insurance in accordance with Section VII.D. below.

D.   The policies required hereunder shall provide for written notice to Hospital at least thirty (30) days prior to the cancellation or modification of any above-mentioned insurance and shall conform to the following:

| PROFESSIONAL & GENERAL LIABILITY INSURANCE | Single Limit … $1,000,000 |
|---|---|
| WORKERS COMPENSATION INSURANCE | As required by State law |
| PROFESSIONAL LIABILITY INSURANCE | $1,000,000 per Occurrence<br>$3,000,000 in Aggregate |

The coverage of any insurance policy required herein or actually carried by Agency shall not limit the extent of Agency's liability under the foregoing indemnity of Section VII.B.

VIII.   MISCELLANEOUS:

A.   <u>Notice</u> – Any notice required or permitted by this Agreement shall be in writing and shall be deemed given at the time it is deposited in the United States mail, postage prepaid, certified or registered mail, return receipt requested, addressed to the party to whom it is to be given as follows:

HOSPITAL:   IASIS Healthcare Holdings, Inc.
555 N. 18th Street, Suite 100
Phoenix, AZ 85006
Attn: Market President

With a copy to:   IASIS Healthcare LLC
Dover Centre, Building E
117 Seaboard Lane
Franklin, TN 37067
Attn: General Counsel

AGENCY:   Favorite Healthcare Staffing, Inc.
7255 W. 98th Terrace, Bldg 5, Ste 150
Overland Park, KS 66212
Phone No.: 888-626-1536
Attn: Contracts Department

Either party may change its address to which notices shall be sent by a notice similarly sent.

B.   <u>Entire Agreement</u>

This Agreement with attachments contains the entire agreement of the parties hereto and supersedes all prior agreements, contracts, and understandings whether written or otherwise between the parties relating to the subject matter hereof. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In the event any provision of this Agreement is found to be legally invalid or unenforceable for any reason, all remaining provisions of this Agreement will remain in full force and effect.

C.   <u>Assignment</u>

This Agreement shall be binding upon and shall inure to the benefit of Agency and Hospital and to Hospital's successors and assigns. Nothing contained in this Agreement shall be construed to permit the assignment by Agency of any rights or obligations hereunder, and such assignment is expressly prohibited without the prior written consent of Hospital. Hospital may assign this Agreement.

D.   <u>Attorneys' Fees</u>

In the event of any litigation by any party to enforce or defend its rights under this Agreement, the prevailing party, in addition to all other relief, shall be entitled to reasonable attorneys' fees.

E.   <u>Non-Exclusivity</u>

The services provided by Agency hereunder are provided on a non-exclusive basis, and Hospital specifically reserves the right to contract with others for similar services.

F.   <u>Open Records Requirements</u>

In the event compensation payable hereunder shall exceed Ten Thousand and no/100 ($10,000.00) per annum, Agency hereby agrees to make available to the Secretary of Health and Human services ("HHS"), the Comptroller General of the Government Accounting Office ("GAO"), Hospital and intermediary and their authorized representative, all

contracts, books, documents, and records that are necessary to certify to the nature and extent of the costs hereunder for a period of four (4) years after the furnishing of services hereunder. In addition, Agency hereby agrees, if services are to be provided by subcontract with a related organization, to require by contract that such subcontractor make available to the HHS, GAO, Hospital, and Intermediary or their authorized representatives, all contracts, books, documents, and records that are necessary to certify the nature and extent of the costs thereunder for a period of four (4) years after the furnishing of services thereunder.

G.   Floating Professionals and Competence

Hospital may float Professional to appropriate units that are within the scope of Professional's clinical expertise, standards of the Hospital's accreditation organizations and state/federal agencies, and to which they have been fully oriented.

H.   OSHA

1.   Agency agrees to comply with OSHA and CDC regulations concerning "Occupational Exposure to Bloodborne Pathogens" by:

A.   Providing education to employees which incorporates OSHA and CDC standards

B.   Providing Hepatitis B Vaccination Series

C.   Maintaining and distributing an Exposure Determination and Control Plan

D.   Maintaining required records

E.   Ensuring proper follow-up evaluations resulting from an exposure incident

F.   Providing authorization and reimbursement for post exposure medical evaluation and follow-up

G.   Providing an explanation of signs, labels, and color-coding used to identify biohazardous materials

2.   Hospital agrees to comply with the provisions of the OSHA regulations regarding bloodborne pathogens.

A.   Inform Professionals as to where Personal Protective Equipment used to protect against bloodborne pathogens is located and provide such equipment free of charge to the Professional

B.   Inform Professionals about Hospital bloodborne pathogen exposure control plan, work practices, engineering controls, Personal Protective Equipment (to include fit testing for TB masks), and emergency procedures for reporting exposure incidents within the Hospital.

C.   Take the following actions in the event of an exposure incident:

a.   Evaluate an exposure incident and provide post exposure care for an incident occurring at the Hospital;

b.   Hospital pre-designated representative shall immediately forward an incident report and invoice for treatment to Agency's insurance department;

c.   Take a blood sample to determine Hepatitis B or HIV infection with the consent of the Professional;

d.   Test, with consent, the source individual's blood to determine Hepatitis B or HIV infection and communicate test results to the Professional along with written follow-up recommendations;

e.   Preserve sample for 90 days if the Professional does not consent to the test; and

f.   Maintain confidential medical records related to the exposure incident with the Professional performing the post exposure testing and follow-up.

I.   Holiday Policies:

Holidays including New Years Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas will be billed at base rate plus $10.00 per hour. This Holiday Rate is in effect for all 12-hour shifts from 7:00 p.m. on the eve of the Holiday to 7:00 p.m. on the night of the Holiday. The Holiday Rate is in effect for all 8-hour shifts from 11:00 p.m. on the eve of the Holiday to 11:00 p.m. on the night of the Holiday.

J.      Orientation:

Orientation will consist of two (2) hours prior to employee's first scheduled work shift. Orientation will be paid by the agency.

K.      Cancellation Clause:

HOSPITAL shall notify Agency two (2) hours prior to the start time to cancel an employee. If such notice of cancellation is more than 15 minutes late, it will result in a two (2) hour charge to the Hospital. If the Hospital fails to notify Agency of the cancellation and the nurse reports to work, there will be a four (4) hour charge to the Hospital. Agency may cancel employee no later than two (2) hours prior to start of shift. If such notification is more than 15 minutes late, it will result in the Agency issuing Hospital a credit for two (2) hours. If the Agency fails to notify Hospital of the cancellation or the employee does not show up for any reason, the Agency will issue Hospital a credit for four (4) hours.

L.      Minimum Billing Rate:

Once Professional has started to work, they are guaranteed a minimum of four (4) hours unless asked to leave the premises as a result of Professional's own gross misconduct. In the event Professional is asked to leave as a result of gross misconduct Professional will be paid for the actual time worked at the Hospital rounded up to the next half hour.

M.      Overtime Clause:

Overtime must be approved by the Director of Nursing or the Chief Nursing Officer prior to the start of the overtime shift.

N.      Statement of Obligations Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5) ("ARRA"). The parties acknowledge that federal regulations relating to the confidentiality of individually identifiable health information require covered entities to comply with the requirements of the Health Insurance Portability and Accountability Act of 1996 (42 USC §1320d et seq.) ("HIPAA"), the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5) ("ARRA"), their implementing privacy and security regulations set forth at 45 CFR Parts 160 and 164 (the "HIPAA Rules") and any applicable state confidentiality laws. Covered entities also must ensure that business associates, who receive confidential information in the course of providing services on their behalf, comply with certain obligations regarding the confidentiality of health information. The parties agree to comply with the terms of the Business Associate Agreement, attached hereto as Exhibit A, and incorporated herein by reference.

**[Signatures on next page.]**

IN WITNESS WHEREOF, Hospital and Agency have duly executed this Agreement on the dates set forth below.


AGENCY:                    **Favorite Healthcare Staffing, Inc.**

                    By:    _____
                                        (Signature)
                    Title:   Senior Vice President
                    Date:
                             9-30-15


ACKNOWLEDGEMENT OF INDIVIDUAL ENTITIES:

**St. Luke's Medical Center, LP**                    **Mountain Vista Medical Center, LP d/b/a**
**d/b/a St. Luke's Medical Center**                  **Mountain Vista Medical Center**
**and d/b/a Tempe St. Luke's Hospital, a campus**
**of St. Luke's Medical Center**


Signature  _____          Signature  _____
Date:      _____          Date:      _____
Title:  CEO _____              Title:  CEO _____

**St. Luke's Behavioral Hospital, LP d/b/a**
**St. Luke's Behavioral Health Center**


Signature  _____
Date:      _____
Title:  CEO _____

ATTACHMENT  I

TO

SUPPLEMENTAL STAFFING AGREEMENT

Part I:        Guidelines for Use of Supplemental Nursing Services
- American Nurses Association Commission on Nursing

Part II:       Standards for Nursing Service
- State Board of Nursing Nurse Practice Act and related documents
- Hospital's accreditation organization and state/federal regulatory agencies

## PART I:     GUIDELINES FOR USE OF SUPPLEMENTAL NURSING SERVICES

This excerpt from the ANA Guidelines provides a list of their Operational Definitions and a breakdown of responsibilities among Agency, Hospital, and nurse when supplemental service nurses are utilized in a healthcare facility.

### OPERATIONAL DEFINITIONS

Agency

An Agency (supplemental staffing service, temporary help, or contracting  Agency) that employs nurses to be placed in healthcare facilities or other organizations to provide nursing care on a temporary basis to meet variable staffing needs.  An agency that places nurses in jobs for a fee or commission

Hospital:

Healthcare facilities or other organizations that utilize supplemental nursing service employees on a temporary basis to meet variable nurse staffing needs.

Professional:

Individual registered nurse, licensed practical nurse or certified nurse assistance employed by a supplemental nursing service and assigned to a utilizing organization to provide nursing care.

Registry:

Organization that, for a fee paid by the nurse, maintains a roster of private duty nurses who contract privately with individuals. This paper does not address the use of private duty nurses.

## 1. RESPONSIBILITIES FOR SELECTION

| | AGENCY | SHARED (Agency and Hospital) | HOSPITAL | NURSE |
|---|---|---|---|---|
| 1. | Select Registered Nurse employee, utilizing the following:<br>• Personal interview criteria<br><br>• Review of education and experience (employees with less than 1 year experience should not be used in this capacity).<br><br>• Skills inventory.<br><br>• Competency testing.<br><br>• Identification of certification, continuing education credit; staff development program(s); special preparation, such as critical care.<br><br>• Health Care statement meeting legal requirements of area.<br><br>Review with prospective employee<br>• Policies<br>• Practices<br>• Job description delineating the functions, responsibilities, and qualifications of the position. | Verify current license in state. | Be aware of selection process used by Agency.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Provide the facility's pertinent practices and job descriptions to Agency | Maintain current licensure.<br><br>Select a reputable Agency.<br><br>Arrange for increasing experience and maintain skills required for practice.<br><br><br><br>Maintain certification, where applicable.<br><br>Maintain Professional liability insurance.<br><br><br>Engage in self-care and health maintenance activities.<br><br><br><br>Obtain satisfactory information to function in setting. |
| 2. | Provide professionally acceptable reference checks. | | | |
| 3. | Provide national criminal background check for past seven (7) years prior to start date. | | | |
| 4. | Provide seven- (7) panel drug screen within three (3) months prior to start date. | | | |

## 2. RESPONSIBILITIES FOR ORIENTATION

| AGENCY | SHARED (Agency and Hospital) | HOSPITAL | NURSE |
|---|---|---|---|
| Include in orientation review of utilizing organization's policies and practices, job description, and brief philosophy of nursing services. | Prepare information and present applicable policies and practices of institution.<br><br>Plan on-site orientation (for accountability for content). | Prepare staff for appropriate utilization of supplemental nursing staff.<br><br>Include in on-site orientation key factors.<br>• Philosophy of nursing service.<br>• Established criteria/ standards for nursing practice and related procedures in the assigned nursing unit.<br>• Identification of and means of reaching immediate supervisor.<br>• Patient care emergency procedures and location of equipment and supplies.<br>• Patient identification system.<br>• Medication procedures.<br>• Documentation procedures.<br>• Location and activation of fire alarm system and other patient safety systems, such as infection control program.<br>• Manner of reporting unusual incidents or injuries. | Be familiar with and accountable for functions within job description.<br><br>Abide by standards of ethical practice and conduct as defined in the ANA Code for Nurses.<br><br>Utilize recognized standards of nursing practice.<br><br>Document the nursing process.<br><br>Adhere to policies and procedures of Hospital and Agency. |

## 3. RESPONSIBILITIES FOR ASSIGNMENT

| AGENCY | SHARED (Agency and Hospital) | HOSPITAL | NURSE |
|---|---|---|---|
| Maintain and update a skill inventory available to the Hospital as a documented tool of existing education, experience, and skill. | Wherever possible, reassign a nurse to the same Hospital and the same unit. | Indicate in request to Agency specific skills needed.<br>• Attempt to match skill of employee to needs of patients.<br>• Require that nurses assigned to special care areas have documented education and experience comparable to that needed.<br>• Do not assign supplemental nursing professional to charge nurse positions, except in instances where the institution knows the competence of the individual.<br>• Give priority, in all cases, to continuity of assignment. | Refuse assignment that is beyond the scope of preparation.<br><br>Appear on duty when assigned.<br><br>Complete assignments according to standards. |

## 4. RESPONSIBILITIES FOR EVALUATION

| AGENCY | SHARED (Agency and Hospital) | HOSPITAL | NURSE |
|---|---|---|---|
| | Establish system for the evaluation of performance, including the following:<br>• System of immediate feedback to deal with unacceptable performance.<br>• Written evaluation at regular intervals.<br>• Review of evaluation with the nurse.<br><br>Maintain record of performance.<br><br>Assign designated individuals to coordinate and monitor the supplemental staffing activities. | Observe nursing performance during assignments in relation to stated standards of care to provide feedback and/or immediate counseling. | Evaluate own performance against standards of practice. |

## 5. RESPONSIBILITIES FOR PROFESSIONAL DEVELOPMENT

| AGENCY | SHARED (Agency and Hospital) | HOSPITAL | NURSE |
|---|---|---|---|
| | Encourage supplemental Professional to maintain and keep abreast of current standards of nursing care through continuing education programs offered within the nursing and healthcare community. | | Keep abreast of changes in nursing through active participation in relevant programs of continuing education. |

## EXHIBIT A

## BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement (the "Agreement"), is made as of the 15th day of September, 2015 (the "Effective Date"), by and between **Favorite Healthcare Staffing, Inc.** ("Business Associate") and **IASIS Healthcare Holdings, Inc., a Delaware corporation, in its capacity as general partner of the following entities: St. Luke's Medical Center, LP; St. Luke's Behavioral Hospital, LP; and Mountain Vista Medical Center, LP** ("collectively Covered Entity") (collectively the "Parties") to comply with the requirements of the Health Insurance Portability and Accountability Act of 1996 (42 USC §1320d *et seq.*) ("HIPAA"), the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5) ("ARRA"), their implementing privacy and security regulations set forth at 45 CFR Parts 160 and 164 (the "HIPAA Rules") and any applicable state confidentiality laws.

NOW THEREFORE, in consideration of the mutual promises and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

A.  Definitions.  Terms used herein, but not otherwise defined, shall have meaning ascribed by the HIPAA Rules. "PHI" means Protected Health Information created or received by Associate for or from Entity.

B.  Status as Business Associate/Permitted Uses and Disclosures. To the extent Associate is acting as a Business Associate of Entity, the provisions of this Agreement shall apply to Associate and Associate shall be subject to penalties as specified in § 13404 of ARRA. Associate will neither use nor disclose PHI except as permitted or required by this Agreement or as Required by Law. Without limiting the foregoing, Associate will not sell PHI or use or disclose PHI for purposes of marketing or fundraising, as defined and proscribed in the HIPAA Rules and ARRA. Associate is permitted to use and disclose PHI as follows:

1.  to perform any and all obligations of Associate as described in the service agreement between the Parties (the "Service Agreement"), provided that such use or disclosure is consistent with the terms of Entity's notice of privacy practices and would not violate the HIPAA Rules, if done by Entity directly;

2.  to perform Data Aggregation services relating to the health care operations of Entity;

3.  to report violations of the law to federal or state authorities consistent with 45 CFR § 164.502(j)(1);

4.  as necessary for Associate's proper management and administration and to carry out Associate's legal responsibilities (collectively "Associate's Operations") provided that any disclosure made for purposes of Associate's Operations is Required By Law or is made after Associate obtains reasonable assurances, evidenced by a written contract, from the recipient that the recipient will: (a) hold such PHI in confidence and use or further disclose it only for the purpose for which Associate disclosed it to the recipient or as Required By Law; and (b) notify Associate of any instance of which the recipient becomes aware in which the confidentiality of such PHI was breached; and

5.  to de-identify PHI in accordance with 45 CFR § 164.514(b) for purposes of performing its obligations under the Service Agreement or for Associate's Operations to the extent permitted by

applicable law. Associate shall not use or disclose PHI to create de-identified information to be used or disclosed for any other purpose without the prior written consent of Entity.

Notwithstanding the foregoing, in the event Entity notifies Associate of a restriction request that would restrict a use or disclosure otherwise permitted by this Agreement, Associate shall comply with the terms of the restriction request.

C.   Obligations of Entity. Entity shall (i) upon request, provide Associate with a copy of the notice of privacy practices that Entity produces pursuant to 45 CFR § 164.520, and Entity shall promptly furnish Associate with copies of any material changes to such notice; (ii) provide Associate with any changes in, or revocation of, permission by an individual to use or disclose PHI, if such changes affect Associate's permitted or required uses or disclosures; (iii) notify Associate of any confidential communication request or restriction to the use or disclosure of PHI affecting Associate that Entity has agreed to in accordance with 45 CFR § 164.522.

D.   Safeguards. Associate will use appropriate administrative, technical and physical safeguards to prevent the use or disclosure of PHI not permitted by this Agreement and shall maintain policies and procedures to detect, prevent, and mitigate identity theft based on PHI or information derived from PHI. Associate agrees to implement and maintain administrative, technical and physical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of electronic PHI. Such safeguards for electronic PHI shall comply with the requirements applicable to Covered Entities under the HIPAA Rules.

E.   Minimum Necessary. Associate represents that the PHI requested, used or disclosed by Associate shall be the minimum amount necessary to provide the Services. Associate will limit its uses and disclosures of, and requests for, PHI (i) when practical, to the information making up a Limited Data Set; and (ii) in all other cases subject to the requirements of 45 CFR § 164.502(b), to the minimum amount of PHI necessary to accomplish the intended purpose of the use, disclosure or request.

F.   Agents and Subcontractors. Associate will require any of its subcontractors and agents, to which Associate discloses any of the PHI to agree by written contract to comply with the same privacy and security obligations as Associate with respect to such PHI. Associate shall be liable to Entity for any acts, failures or omissions of the agent or subcontractor in providing the services as if they were Associate's own acts, failures or omissions, to the extent permitted by law.

G.   Policies and Training. Associate has policies in place regarding the confidential and secure treatment of PHI. Associate shall require its employees to adhere to such policies and shall train its employees regarding the requirements of this Agreement and applicable confidentiality and security laws and regulations.

H.   Access and Amendment. To the extent required for Covered Entities by 45 CFR § 164.524, Associate will promptly permit Entity or, at Entity's request, an Individual (or the Individual's personal representative) to inspect and obtain copies of any PHI about the Individual that is in Associate's custody or control and that is maintained in a Designated Record Set. Associate will notify Entity of any request (including but not limited to subpoenas) that Associate receives for access to PHI that is in Associate's custody or control within five (5) business days of receipt of such request. Entity shall be responsible for making determinations about access. Associate will, upon receipt of notice from Entity, promptly amend or permit Entity access to amend any portion of the PHI that is in Associate's custody or control so that Entity may meet its amendment obligations under 45 CFR § 164.526.

I.   Accounting of Disclosures. Except for disclosures excluded from the accounting obligation by the HIPAA Rules and regulations issued pursuant to ARRA, Associate will record for each disclosure that Associate makes of PHI the information necessary for Entity to make an accounting of disclosures pursuant to the

HIPAA Rules. Associate will make this information available to Entity promptly upon Entity's request for the period requested, but for no longer than the six (6) years preceding Entity's request for the information (except Associate need not have any information for disclosures occurring before the effective date of any previous HIPAA business associate agreements between the parties or, if none, the Effective Date).

J.  Books and Records. Associate will make its internal practices, books, and records, relating to its use and disclosure of the PHI available upon request to Entity or the Secretary of U.S. Department of Health and Human Services ("HHS") to determine Entity's compliance with the HIPAA Rules. Notwithstanding the above, no attorney-client, accountant-client, or other legal privilege shall be deemed waived by Entity or Associate by virtue of this provision.

K.  Withdrawal of Authorization.  If the use or disclosure of PHI in this Agreement is based upon an Individual's specific authorization for the use or disclosure of his or her PHI, and the Individual revokes such authorization, the effective date of such authorization has expired, or such authorization is found to be defective in any manner that renders it invalid, Associate shall, if it has notice of such revocation, expiration, or invalidity, cease the use and disclosure of the Individual's PHI except to the extent it has relied on such use or disclosure, or if an exception under the HIPAA Rules expressly applies.

L.  Reporting. Associate shall promptly report to Entity, to the extent Associate becomes aware of or discovers any of the following: any use or disclosure of PHI not permitted by this Agreement, any Security Incidents involving electronic PHI, any Breach of Unsecured Protected Health Information ("Breach") and any Red Flag (as defined at 16 CFR § 681.2(b)) related to any individual who is the subject of PHI. Associate shall mitigate, to the extent practicable, any harmful effect known to it of a Security Incident, Breach or use or disclosure of PHI by Associate not permitted by this Agreement. Notwithstanding the foregoing, the parties acknowledge and agree that this section constitutes notice by Associate to Entity of the ongoing existence and occurrence of attempted but Unsuccessful Security Incidents (as defined below) for which no additional notice to Entity shall be required. "Unsuccessful Security Incidents" shall include, but not be limited to, pings and other broadcast attacks on Associate's firewall, port scans, unsuccessful log-on attempts, denials of service and any combination of the above, so long as no such incident results in unauthorized access, use or disclosure of electronic PHI. All reports of Breaches shall be made within ten (10) business days of Associate discovering the Breach and shall include the information specified at 45 CFR § 164.410. Associate shall promptly reimburse Entity all reasonable costs incurred by Entity with respect to providing notification of and mitigating a Breach involving Associate, including but not limited to printing, postage costs and toll-free hotline costs.

M.  Term and Termination.

1.  Term.  This Agreement shall be effective as of the Effective Date and shall remain in effect until terminated pursuant to Section M.2 below or the Service Agreement terminates, whichever is earlier.

2.  Termination for Breach.  If Associate breaches any provision in this Agreement, Entity may, at its option, access and audit the records of Associate related to its use and disclosure of PHI, require Associate to submit to monitoring and reporting, and such other conditions as Entity may determine is necessary to ensure compliance with this Agreement, or Entity may terminate this Agreement on a date specified by Entity. In addition, either of the Parties may terminate this Agreement effective immediately if it determines that the other Party has breached a material provision of this Agreement and failed to cure such breach within thirty (30) days of being notified by the other Party of the breach. If the non-breaching Party determines that cure is not possible, such Party may terminate this Agreement effective immediately upon written notice to other Party. If termination is not feasible, the non-breaching Party shall report the breach to HHS.

3.  <u>Effect of Termination</u>.  Upon termination of this Agreement for any reason, Associate agrees, at no cost to Entity, to return or destroy, in a secure manner, all PHI, maintained by Associate (or its subcontractors or agents) in any form.  If Associate determines that the return or destruction of PHI is infeasible, Associate shall inform Entity in writing of the reason thereof, and shall agree to extend the protections of this Agreement to such PHI and limit further uses and disclosures of the PHI to those purposes that make the return or destruction of the PHI infeasible for so long as Associate retains the PHI. The respective rights and obligations of Business Associate under this Agreement shall survive termination and remain in effect (a) until Associate has completed the return or destruction of PHI as required by this Section and (b) to the extent Associate retains any PHI pursuant to this Section.

N.  <u>Miscellaneous.</u>

1.  <u>Amendments</u>.  This Agreement may not be changed or modified in any manner except by an instrument in writing signed by a duly authorized officer of each of the Parties hereto.  The Parties, however, agree to amend this Agreement from time to time as necessary, in order to allow Entity's to comply with the requirements of the HIPAA Rules.

2.  <u>No Waiver</u>.  Failure or delay on the part of either Party to exercise any right, power, privilege or remedy hereunder shall not constitute a waiver thereof.  No provision of this Agreement may be waived by either Party except by a writing signed by an authorized representative of the Party making the waiver.

3.  <u>Equitable Relief</u>.  Any disclosure of misappropriation of PHI by Associate in violation of this Agreement will cause Entity irreparable harm, the amount of which may be difficult to ascertain. Associate therefore agrees that Entity shall have the right to apply to a court of competent jurisdiction for specific performance and/or an order restraining and enjoining Associate from any such further disclosure or breach, and for such other relief as Entity shall deem appropriate.  Such rights are in addition to any other remedies available to Entity at law or in equity.  Associate expressly waives the defense that a remedy in damages will be adequate, and further waives any requirement in an action for specific performance or injunction for the posting of a bond by Entity.

4.  <u>Interpretation</u>. Any ambiguity in this Agreement shall be resolved to permit Entity to comply with the HIPAA Rules. Nothing in this Agreement shall be construed to create any rights or remedies in any third parties or any agency relationship between the parties.  A reference in this Agreement to a section in the HIPAA Rules means the section as in effect or as amended. This Agreement shall be incorporated into the Service Agreement and subject to any notice, choice of law, waiver or similar provisions of the Service Agreement. The provisions of this Agreement shall prevail over any conflicting provisions of the Service Agreement and any other agreement that exists between the Parties that may conflict with, or appear inconsistent with, any provision of this Agreement or the HIPAA Rules. Associate shall agree to conduct business in accordance with the standards of conduct set forth by Entity ("*Our Common Bond*").

[Signatures on next page.]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date indicated above.

Favorite Healthcare Staffing, Inc.
("Business Associate")

By: _____

Name: _Debra MacLeod, RN, SVP_____

Title: _Senior Vice President_____

ACKNOWLEDGEMENT OF INDIVIDUAL ENTITIES:

St. Luke's Medical Center, LP
d/b/a St. Luke's Medical Center
and d/b/a Tempe St. Luke's Hospital, a campus
of St. Luke's Medical Center

Signature _____
Date: _____
Title: _CEO_____

St. Luke's Behavioral Hospital, LP d/b/a
St. Luke's Behavioral Health Center

Signature _____
Date: _____
Title: CEO_____

Mountain Vista Medical Center, LP d/b/a
Mountain Vista Medical Center

Signature _____
Date: _____
Title: _CEO_____

# EXHIBIT "B"



# AMENDMENT

### to Supplemental Staffing Agreement between
### Favorite Healthcare Staffing, Inc. and
### IASIS Healthcare Holdings, Inc.

This Amendment is entered into between Favorite Healthcare Staffing, Inc. ("Favorite") and IASIS Healthcare Holdings, Inc. ("Client").

Favorite and Client entered into a Supplemental Staffing Agreement effective 9/15/2015, which may include Exhibits, Addendums, and Amendments (collectively referred to as the "Agreement") and the parties now desire to amend the Agreement as stated in this Amendment.

The following additions to the Agreement are hereby made effective 2/3/2018 or by the date of the last signature; whichever comes first. In the event this Amendment is not signed, failure to object to such rates and/or terms within 30 days of the effective date shall constitute acceptance.

*Amend by adding the following to Page 17, Addendum A, Rates and Fees:*

Travel/Contract

| Classification | Area | Hourly Bill Rate |
|---|---|---|
| RN | ER, ICU, NICU | 65.00 |

## CANCELLATIONS

A. Travel/Contract

1. Client may cancel an assignment prior to starting with a two (2) week prior written notice. If Client gives less than a two (2) week prior notice, Favorite will bill Client for one (1) week at the appropriate bill rate.

2. In the event Client finds it necessary to terminate a Contract THP's assignment during the assignment, for no fault of Favorite or Contract THP, the Client shall reimburse Favorite for one (1) week at the appropriate bill rate, and for all contractual obligations for transportation and housing incurred as a result of Favorite's placement of Contract THP with Client.

3. Client acknowledges that a reimbursement or other expense allowance arrangement exists between the parties with respect to housing and meals paid to healthcare professionals who are on travel assignments. Favorite will provide a statement to Client on an annual basis of the reimbursement amount which may be subject to tax deduction limitations.

Except as modified herein, all provisions of the Supplemental Staffing Agreement and any prior Amendments and/or Addendums will remain in full force and effect.

This Amendment may be executed in separate counterparts. Any signature delivered via telecopy or other facsimile transmission shall be deemed equivalent to physical delivery of the original signature page. Any signature page of any counterpart hereof, whether being and original signature or an electronic facsimile transmission of a signature may be appended to any other counterpart hereof to form a completely executed counterpart hereof.



By execution of this Amendment, each party acknowledges and agrees that it has received sufficient consideration for the agreements made herein.  In the event this Amendment is not signed, failure to object to such rates and/or terms and conditions within 30 days of the effective date shall constitute acceptance.

*In witness whereof, the undersigned represents that he/she is duly authorized by the parties to enter in to this Agreement and bind their respective party to performing the terms and conditions of the Agreement and this Amendment.*

**AGREEMENT SIGNATURES:**

| | |
|---|---|
| **Favorite Healthcare Staffing, Inc.** ("Favorite") | **IASIS Healthcare Holdings, Inc.** ("Client") |
| By: _Debra Macleod (Feb 6, 2018)_ | By: _Elizabeth Kearney_ Elizabeth Kearney (Feb 6, 2018) |
| Authorized Signatures: Kathleen A. Perry, RN, MBA, President Debra MacLeod, RN, Vice President Cathy Vollmer, RN, BSN, Vice President Gerhard J. Kuti, CEO | Name: _ Elizabeth Kearney **Please Print** |
| | Title: _ Chief Nursing Officer |
| Date: _ Feb 6, 2018 | Date: _ Feb 6, 2018 |



# AMENDMENT #2

### to Supplemental Staffing Agreement between
### Favorite Healthcare Staffing, Inc. and
### IASIS Healthcare Holdings, Inc.

This Amendment is entered into between Favorite Healthcare Staffing, Inc. ("Favorite") and IASIS Healthcare Holdings, Inc. ("Client").

Favorite and Client entered into a Supplemental Staffing Agreement effective 9/15/2015, which may include Exhibits, Addendums, and Amendments (collectively referred to as the "Agreement") and the parties now desire to amend the Agreement as stated in this Amendment.

The following additions to the Agreement are hereby made effective 9/14/2018 or by the date of the last signature; whichever comes first. In the event this Amendment is not signed, failure to object to such rates and/or terms within 30 days of the effective date shall constitute acceptance.

*Amend by revising Page 2, Section V(A) to read as follows:*

## V. TERM AND TERMINATION

   A.     The Agreement shall remain in effect for a term of three (3) years beginning September 15, 2015, and ending at midnight September 14, 2018. After the initial three (3) year term, the Agreement shall automatically renew for additional one (1) year terms unless either party shall give the other party written notice of termination as provided herein."

*Amend by adding the following rates to Addendum A, Rates and Fees:*

   A. Per Diem

| Classification | Weekday | | | Weekend | | |
|---|---|---|---|---|---|---|
| | DAY | EVE | NIGHT | DAY | EVE | NIGHT |
| Radiology Tech / X-Ray Tech | 27.50 | 29.50 | 30.50 | 27.50 | 29.50 | 30.50 |
| CT Tech / MRI Tech | 32.00 | 34.00 | 35.00 | 32.00 | 34.00 | 35.00 |
| Ultrasound Technician | 38.00 | 40.00 | 41.00 | 38.00 | 40.00 | 41.00 |
| Interventional Rad Tech | 35.00 | 37.00 | 38.00 | 35.00 | 37.00 | 38.00 |
| Nuclear Med Tech | 35.00 | 37.00 | 38.00 | 35.00 | 37.00 | 38.00 |
| CRT / RRT | 45.00 | 47.00 | 48.00 | 45.00 | 47.00 | 48.00 |
| All Classifications - On Call | 4.50 | 4.50 | 4.50 | 4.50 | 4.50 | 4.50 |

   B. Local Travel/Contract (50 miles or less from facility)

| Classification | Hourly Bill Rate |
|---|---|
| Registered Nurse (Areas: ER, ICU, NICU, OR, Labor/Delivery) | 65.00 |
| Cath Lab Technologist | 68.00 |
| CRT / RRT | 58.00 |
| CT Tech / MRI Tech | 58.00 |
| CVOR Technician | 54.00 |
| Echo Technologist | 70.00 |
| Mammographer | 58.00 |
| Nuclear Med Tech | 60.00 |
| OR Tech / Certified Surgical Tech | 52.00 |
| Radiology Tech / X-Ray Tech | 49.00 |
| Sterile Processing Tech | 50.00 |
| Ultrasound Technician | 60.00 |
| All Classifications - On Call | 4.50 |



C.  True Travel (more than 50 miles from facility)

| Classification | Hourly Bill Rate |
|---|---|
| Registered Nurse (Areas: ER, ICU, NICU, OR, Labor/Delivery) | 65.00 |
| Cath Lab Technologist | 85.00 |
| CRT / RRT | 58.00 |
| CT Tech / MRI Tech | 74.00 |
| CVOR Technician | 54.00 |
| Echo Technologist | 70.00 |
| Mammographer | 65.00 |
| Nuclear Med Tech | 74.00 |
| OR Tech / Certified Surgical Tech | 52.00 |
| Radiology Tech / X-Ray Tech | 65.00 |
| Sterile Processing Tech | 50.00 |
| Ultrasound Technician | 76.00 |
| All On Call | 4.50 |

Except as modified herein, all provisions of the Supplemental Staffing Agreement and any prior Amendments and/or Addendums will remain in full force and effect.

This Amendment may be executed in separate counterparts. Any signature delivered via telecopy or other facsimile transmission shall be deemed equivalent to physical delivery of the original signature page.  Any signature page of any counterpart hereof, whether being and original signature or an electronic facsimile transmission of a signature may be appended to any other counterpart hereof to form a completely executed counterpart hereof.

By execution of this Amendment, each party acknowledges and agrees that it has received sufficient consideration for the agreements made herein.  In the event this Amendment is not signed, failure to object to such rates and/or terms and conditions within 30 days of the effective date shall constitute acceptance.

In witness whereof, the undersigned represents that he/she is duly authorized by the parties to enter in to this Agreement and bind their respective party to performing the terms and conditions of the Agreement and this Amendment.

AGREEMENT SIGNATURES:

**Favorite Healthcare Staffing, Inc.**
**("Favorite")**

By: _____ *Debra MacLeod* _____
Debra MacLeod (Dec 5, 2018)
Authorized Signatures:
   Kathleen A. Perry, RN, MBA, President
   Debra MacLeod, RN, Vice President
   Cathy Vollmer, RN, BSN, Vice President
   Gerhard J. Kuti, CEO

Date: _ Dec 5, 2018

**IASIS Healthcare Holdings, Inc.**
**("Client")**

By: _ *Stephanie Jenkins, RN* _
Stephanie Jenkins, RN (Dec 5, 2018)

Name: _ Stephanie Jenkins, RN
            **Please Print**

Title: _ DIrector of Staffing & Workforce Plannin_

Date: _ Dec 5, 2018



# AMENDMENT #3

**to Supplemental Staffing Agreement between
Favorite Healthcare Staffing, Inc. and
IASIS Healthcare Holdings, Inc.**

This Amendment is entered into between Favorite Healthcare Staffing, Inc. ("Favorite") and IASIS Healthcare Holdings, Inc. ("Client").

Favorite and Client entered into a Supplemental Staffing Agreement effective 9/15/2015, which may include Exhibits, Addendums, and Amendments (collectively referred to as the "Agreement") and the parties now desire to amend the Agreement as stated in this Amendment.

The following additions to the Agreement are hereby made effective 8/1/2020 or by the date of the last signature; whichever comes first.  In the event this Amendment is not signed, failure to object to such rates and/or terms within 30 days of the effective date shall constitute acceptance.

*Amend by revising Addendum A, Rates and Fees to read as follows:*

A.  Per Diem

| Classification | Area | Weekday Hourly Bill Rate | Weekend Hourly Bill Rate |
|---|---|---|---|
| RN | Med/Surg | 64.00 | 66.00 |
| RN | Med/Surg Charge | 69.00 | 71.00 |
| RN | Specialty I | 69.00 | 72.00 |
| RN | Specialty I Charge | 74.00 | 77.00 |
| RN | Specialty II | 80.00 | 80.00 |
| LPN / LVN | | 48.00 | 50.00 |
| CNA | | 26.00 | 28.00 |
| CNA Private Duty | Private Duty | 22.50 | 24.00 |
| Behavioral Health Technician | | 27.00 | 29.00 |
| CMA / CMT | | 26.00 | 28.00 |
| CRT / RRT | | 63.00 | 63.00 |
| CST / ORT | | 52.00 | 52.00 |
| CT Technologist | | 70.00 | 70.00 |
| CVOR Technician | | 56.00 | 56.00 |
| Echo Technologist | | 83.00 | 83.00 |
| Medical Assistant | | 29.00 | 29.00 |
| Medical Laboratory Technician | | 56.00 | 56.00 |
| Medical Technologist | | 58.00 | 58.00 |
| MRI Technician | | 70.00 | 70.00 |
| NP / PA | | 96.00 | 98.00 |
| Phlebotomist | | 29.00 | 29.00 |
| PT / OT / Speech | | 64.00 | 66.00 |
| PTA / COTA | | 55.00 | 55.00 |
| Radiology Technologist | | 68.00 | 68.00 |
| Sterile Processing Tech | | 50.00 | 50.00 |
| Ultrasound Technician | | 75.00 | 75.00 |
| All Classifications | On Call | 4.50 | 4.50 |

7255 W. 98TH TERRACE-BLDG.5, SUITE 150 • OVERLAND PARK, KS 66212-2215 • PHONE 800-676-3456 • FAX 888-870-6530
www.favoritestaffing.com
Page 1 of 3

7 IASIS Healthcare Holdings, Inc.

*Amendment #3-Update Rates*



Standard Scheduling Areas

| Private Duty: | Sitter, 1:1 ratio |
|---|---|
| Med/Surg: | Gen. Staff, Psych, Peds, Mother/Baby, Case Management, Rehab, and Nursery |
| Specialty I: | ER, PCU, ICU, Step-Down, Tele, Dialysis, Burn Unit, Oncology (Chemo Certified), and PACU |
| Specialty II: | L&D, Cath Lab, Endoscopy, Interventional Radiology, OR, CVOR, RN First Assist, CVICU, PICU, NICU, EP Lab, and GI Lab |
| Rapid Response | On-going Urgent and Unfilled needs |
| On-Call | When THP / Traveler is called in, Client will be billed at 1.50 of the regular hourly rate for hours worked.  Minimum call back is four (4) hours. |

B.  Travel/Contract

| Classification | Hourly Bill Rate |
|---|---|
| Registered Nurse (Areas: ER, ICU, NICU, OR, Labor/Delivery) | 78.00 |
| Cath Lab Technologist | 85.00 |
| CRT / RRT | 61.00 |
| CT Tech / MRI Tech | 74.00 |
| CVOR Technician | 67.00 |
| Echo Technologist | 87.00 |
| Mammographer | 71.00 |
| Nuclear Med Tech | 74.00 |
| OR Tech / Certified Surgical Tech | 65.00 |
| Radiology Tech / X-Ray Tech | 65.00 |
| Sterile Processing Tech | 63.00 |
| Ultrasound Technician | 76.00 |
| All On Call | 4.50 |

Except as modified herein, all provisions of the Supplemental Staffing Agreement and any prior Amendments and/or Addendums will remain in full force and effect.

This Amendment may be executed in separate counterparts. Any signature delivered via telecopy or other facsimile transmission shall be deemed equivalent to physical delivery of the original signature page.  Any signature page of any counterpart hereof, whether being and original signature or an electronic facsimile transmission of a signature may be appended to any other counterpart hereof to form a completely executed counterpart hereof.

By execution of this Amendment, each party acknowledges and agrees that it has received sufficient consideration for the agreements made herein.

Please contact Elisa Davis, Senior Branch Director at 520-319-5766 or edavis@favoritestaffing.com with any questions you may have.


[signatures on following page]



In witness whereof, the undersigned represents that he/she is duly authorized by the parties to enter in to this Agreement and bind their respective party to performing the terms and conditions of the Agreement and this Amendment.

**AGREEMENT SIGNATURES:**

**Favorite Healthcare Staffing, Inc.**
**("Favorite")**

By: _Paul Brown_
Paul Brown (Jul 23, 2020 18:55 CDT)
Authorized Signatures:
  Christopher Brink, President
  Debra MacLeod, RN, Senior Vice President
  Paul Brown, Vice President
  Stephanie Render, Regional Director
  Keenan Driver, Vice President
  Corey Shepard, Vice President
  Michael Bellari, Vice President

Date:  _ Jul 23, 2020

**IASIS Healthcare Holdings, Inc.**
**("Client")**

By: _Stephanie Jenkins, RN_

Name: _ Stephanie Jenkins
                    **Please Print**

Title: _ Executive Director, Staffing & Workforce_

Date: _ Jul 23, 2020



## ACUTE CARE | LTAC | BEHAVIORAL HEALTH RATE AGREEMENT

**Please fill in Client Information:**

| | |
|---|---|
| Client Legal Name | IASIS Healthcare Holdings, INC |
| Address | |
| City, State, Zip | |
| Attention | |

These Rates and Standard Terms and Conditions are effective **12/4/21** _____ or upon services provided to Client. In the event services are provided to Client by Favorite, and this agreement is not signed; Client's acceptance of our services will be deemed as acceptance of the terms of this agreement.

## DEFINITIONS

A. <u>THP</u> is a temporary healthcare professional working as an employee of Favorite on assignment at Client.

B. <u>Per Diem THP</u> is any THP not regarded as a Traveler under this agreement.

C. <u>Traveler</u> is any THP provided by Favorite for whom a Confirmation of terms of an assignment of not less than 4 weeks in duration has been made by Client.

D. <u>Confirmation</u> is the Client's written acceptance of a particular Traveler to fill a specific Client need.

## 1. RATES

Rates are subject to change with a written notice.

| Classifications | Base Rate | Incentive Rate | Urgent Rate | Crisis Rate |
|---|---|---|---|---|
| RN Med/Surg | 72.00 | 79.20 | 93.60 | 115.20 |
| RN Med/Surg Charge | 77.00 | 84.70 | 100.10 | 123.20 |
| RN Specialty I | 75.00 | 82.50 | 97.50 | 120.00 |
| RN Specialty I Charge | 80.00 | 88.00 | 104.00 | 128.00 |
| RN Specialty II | 82.00 | 90.20 | 106.60 | 131.20 |
| LPN/LVN | 61.00 | 67.10 | 79.30 | 97.60 |
| CMT/CMA | 36.00 | 39.60 | 46.80 | 57.60 |
| CNA | 33.00 | 36.30 | 42.90 | 52.80 |
| CNA Private Duty | 30.00 | 33.00 | 39.00 | 48.00 |
| Medical Assistant | 45.00 | 49.50 | 58.50 | 72.00 |
| Behavioral Health Tech | 48.00 | 52.80 | 62.40 | 76.80 |
| Phlebotomist | 48.00 | 52.80 | 62.40 | 76.80 |
| CRT/RRT | 85.00 | 93.50 | 110.50 | 136.00 |
| CST/ORT | 80.00 | 88.00 | 104.00 | 128.00 |
| CT/Rad Technologist | 85.00 | 93.50 | 110.50 | 136.00 |
| CVOR Technician | 95.00 | 104.50 | 123.50 | 152.00 |
| Echo Technologist | 90.00 | 99.00 | 117.00 | 144.00 |
| Medical Technologist | 90.00 | 99.00 | 117.00 | 144.00 |
| Medical Laboratory Technician | 85.00 | 93.50 | 110.50 | 136.00 |
| MRI Technician | 85.00 | 93.50 | 110.50 | 136.00 |
| NP/PA | 100.00 | 110.00 | 130.00 | 160.00 |

7255 W. 98TH TERRACE-BLDG.5, SUITE 150 ● OVERLAND PARK, KS 66212-2215 ● PHONE 800-676-3456 ● FAX 888-870-6530

6.ACLTACBH.Std.21, 6.ACLTACBH.INC.21,
6.ACLTACBH.URG.21, 6.ACLTACBH.CRI.21

www.favoritestaffing.com
Page 1 of 4

9/23/2021

**Favorite** Healthcare Staffing

| | | | | |
|---|---|---|---|---|
| OT/PT/ST | 85.00 | 93.50 | 110.50 | 136.00 |
| COTA/PTA | 60.00 | 66.00 | 78.00 | 96.00 |
| EMT | 55.00 | 60.50 | 71.50 | 88.00 |
| Sterile Processing Tech | 65.00 | 71.50 | 84.50 | 104.00 |
| Ultrasound Technician | 85.00 | 93.50 | 110.50 | 136.00 |
| Pharmacy Technician | 55.00 | 60.50 | 71.50 | 88.00 |
| Pharmacist | 115.00 | 126.50 | 149.50 | 184.00 |
| Registered Dietician | 65.00 | 71.50 | 84.50 | 104.00 |
| Social Worker | 75.00 | 82.50 | 97.50 | 120.00 |
| Dietary | 35.00 | 38.50 | 45.50 | 56.00 |
| Environmental Services | 35.00 | 38.50 | 45.50 | 56.00 |
| All Classifications - On Call | 10.00 | 10.00 | 10.00 | 10.00 |

*All other allied clinical and non-clinical classes not included can be negotiated upon need.

Areas

| | |
|---|---|
| Private Duty: | Sitter, 1:1 ratio |
| Med/Surg: | Gen. Staff, Psych, Peds, Mother/Baby, Case Management, Rehab, Nursery and Long Term Acute Care |
| Specialty I: | ER, PCU, ICU, Step-Down, Tele, Dialysis, Burn Unit, Oncology (Chemo Certified), and PACU |
| Specialty II: | L&D, Cath Lab, Endoscopy, Interventional Radiology, OR, CVOR, RN First Assist, CVICU, PICU, NICU, EP Lab, and GI Lab |
| Incentive, Urgent, Crisis | Client may designate certain specialties as urgent, immediate, or special for which Client may expressly approve in the Assignment Request the use of the Incentive, Urgent or Crisis Rates as set forth in the rate schedule for the duration of such assignment to fill a Client need for a THP which Client views as unusually urgent, immediate, or special, and for which one or more THP's might otherwise be unavailable. Incentive, Urgent, and Crisis Rates are dependent upon State laws or restrictions, and only appliable when permitted. |
| On-Call | When THP / Traveler is called in, Client will be billed at 1.50 of the regular hourly rate for hours worked.  Minimum call back is four (4) hours. |

## 2.  OVERTIME

Work week begins Saturday at 7:00 AM.  Weekend rates begin Friday at 3:00PM and end Monday at 6:59AM.  Overtime rates will apply as indicated by local labor statute.

| Hours in Excess of: | Per: | Overtime Multiplier: |
|---|---|---|
| 40.00 | W | 1.50 |

## 3.  HOLIDAYS

The following holidays will be charged at 1.5 times regular rate:

| HOLIDAY | SHIFTS |
|---|---|
| Thanksgiving Day Eve | 11-7 |
| New Year's Eve; Christmas Eve | 3-11, 11-7 |
| Easter Day; Thanksgiving Day | 7-3, 3-11 |
| New Year's Day; Memorial Day; July 4th; Labor Day; Christmas Day | 7-3, 3-11, 11-7 |

7255 W. 98TH TERRACE-BLDG.5, SUITE 150 ● OVERLAND PARK, KS 66212-2215 ● PHONE 800-676-3456 ● FAX 888-870-6530

6.ACLTACBH.Std.21, 6.ACLTACBH.INC.21,
6.ACLTACBH.URG.21, 6.ACLTACBH.CRI.21

www.favoritestaffing.com
Page 2 of 4

9/23/2021



## 4. CANCELLATIONS

A. <u>Per Diem</u>
Minimum billing rate once supplemental personnel have started to work is 4 hours.

Client may cancel 2.00 hours prior to the start of the shift. If Client cancels with less than a 2.00 hour notice, Favorite will bill for 2.00 hours at the regular hourly rate.

B. <u>Travel/Contract</u>
1. Client may cancel an assignment prior to starting with a two (2) week prior written notice. If Client gives less than a two (2) week prior notice, Favorite will bill Client for one (1) week at the appropriate bill rate.

2. In the event Client finds it necessary to terminate a Contract THP's assignment during the assignment, for no fault of Favorite or Contract THP, the Client shall reimburse Favorite for one (1) week at the appropriate bill rate, and for all contractual obligations for transportation and housing incurred as a result of Favorite's placement of Contract THP with Client.

3. Client acknowledges that a reimbursement or other expense allowance arrangement exists between the parties with respect to housing and meals paid to healthcare professionals who are on travel assignments. Favorite will provide a statement to Client on an annual basis of the reimbursement amount which may be subject to tax deduction limitations.

## 5. OTHER

A. Orientation shifts are billed at the regular hourly rates.

B. All THP bonuses provided by Client are subject to deductions for payroll burden and miscellaneous expenses.

C. Unless otherwise agreed upon in writing, Favorite's *Standard Terms and Conditions of Service and Standard Hiring Practices*, published at www.favoritestaffing.com, shall apply and can be found by going to "MENU", "CLIENT SERVICES". All of these current Terms and Conditions have already been incorporated into this agreement.

D. This Agreement may be modified or amended by written agreement and supersedes all prior Agreements of the parties.

*Favorite and CLIENT agree that rates will be reviewed annually and will be subject to incremental adjustments at a minimum rate in accordance with the current Consumer Price Index. Such adjustments shall apply when applicable as an offset to increasing overhead costs attributable to expenses such as but not limited to: payroll taxes, workmen's compensation, unemployment expenses, health benefits, meals/incidentals and lodging, etc. Rate adjustments will be provided with a written notice, and agreed upon by mutual written agreement.*

[signatures on following page]



6.  **SIGNATURES**

("Client")

Signature: _____

Name: _____
**Please Print**

Title: _____

Date: _____



 Joint Commission Health Care
Staffing Services Certification



## STANDARD TERMS AND CONDITIONS OF SERVICE

This document describes the standard terms and conditions for the provision of services by Favorite Healthcare Staffing, Inc. to its clients. In the event any of these terms and conditions conflict with other arrangements agreed upon in writing or stated in a Favorite Healthcare Staffing, Inc. agreement or rate agreement, such other terms and conditions shall apply. Changes to these standard terms and conditions of service may occur from time to time and will be published at the www.favoritestaffing.com public website and can be found by going to "MENU", "CLIENT SERVICES".

### DEFINITIONS

E.   THP is a temporary healthcare professional working as an employee of Favorite on assignment at Client.

F.   Per Diem THP is any THP not regarded as a Traveler under this agreement.

G.   Traveler is any THP provided by Favorite for whom a Confirmation of terms of an assignment of not less than 4 weeks in duration has been made by Client.

H.   Confirmation is the Client's written acceptance of a particular Traveler to fill a specific Client need.

### The Responsibilities of Favorite Healthcare Staffing, Inc.:

It is Favorite Healthcare Staffing, Inc.'s responsibility to:

1.   Provide services in conformance with all Joint Commission standards applicable to Health Care Staffing Services.

2.   Provide service coordinator staff on a 24 hour per day, 365 day per year basis to receive and process service requests and changes.

3.   Match client service requests with Temporary Healthcare Personnel (THPs) who are properly screened and qualified in accordance with our standard hiring practices.

4.   Provide clients, upon request, with documentation of the skills and qualifications of assigned personnel, either via e-mail or facsimile.

5.   Instruct all THPs to always carry on their person an original license, evidence of current CPR and any applicable specialty certifications, for immediate client inspection.

6.   Assume sole responsibility as the employer of record for the payment of wages to THPs and for the withholding of applicable federal, state and local income taxes, the making of required Social Security tax contributions, and the meeting of all other statutory employer responsibilities (including, but not limited to, unemployment and worker's compensation insurance, payroll excise taxes, etc.).

7.   Comply with federal, state and local labor and employment laws applicable to Assigned Employees, including the Immigration Reform and Control Act of 1986; the Internal Revenue Code ("Code"); the Employee Retirement Income Security Act ("ERISA"); the Health Insurance Portability and Accountability Act ("HIPAA"); the Family Medical Leave Act; Title VII of the Civil Rights Act of 1964; the Americans with Disabilities Act; the Fair Labor Standards Act; the Consolidated Omnibus Budget Reconciliation Act ("COBRA"); the Uniformed Services Employment and Reemployment Rights Act of 1994; as set forth in subparagraph h. below, the Patient Protection and Affordable Care Act (ACA); and the Occupational Safety and Health Act of 1970.

8.   Comply with all provisions of the ACA applicable to Assigned Employees, including the employer shared responsibility provisions relating to the offer of "minimum essential coverage" to "full-time" employees (as those terms are defined in Code §4980H and related regulations) and the applicable employer information reporting provisions under Code §6055 and §6056 and related regulations.

9.   Maintain a system documenting, tracking, and reporting unexpected incidents, including errors, unanticipated deaths and other events, injuries, and safety hazards relating to the care and services provided. (It is the Clients' responsibility to promptly notify Favorite Healthcare Staffing within 24 hours of when an incident occurs. Upon notification, Favorite Healthcare Staffing will then implement incident tracking/resolution processes and communicate with the client as needed.) Client may be required to provide written documentation to Favorite to facilitate the investigation and potential corrective actions of incidents. Depending on the severity of the incident; Favorite will also have our Risk Oversight Committee review and make recommendations.

10.  Maintain general liability insurance and professional liability insurance with limits equal to or greater than $1,000,000 per occurrence and $3,000,000 aggregate. Maintain workers compensation in the amounts mandated by law in the state or states in which services are being performed. Favorite will provide certificates of insurance on request.

11.  May use subcontractors in the usual course of providing staffing services.

12.  Not discriminate in employment with respect to race, religion, sex, creed, disability or national origin in compliance with all applicable laws including Title VII of the Civil Rights Acts of 1964, or any of its amendments, and the Americans with Disabilities Act.

13.  Comply with Section 1861(v) of the Social Security Act, and, therefore, for a period of four years, make available upon written request such books, documents and records as are necessary to certify the nature and extent of the cost of providing services.





Joint Commission Health Care
Staffing Services Certification

## STANDARD TERMS AND CONDITIONS OF SERVICE

The Roles/Responsibilities of Client:

1. Make final determination of the suitability of THP documented competencies and experience as presented by Favorite Healthcare Staffing, Inc. for the designated assignment.

2. Provide orientation which, at minimum, includes the review of policies and procedures regarding medication administration, documentation procedures, patient rights, Infection Prevention, and Fire and Safety, OSHA and EMR/Charting (if applicable).

3. Manage Favorite Healthcare Staffing, Inc.' THPs consistent with their own policies and procedures and address any incident consistent with those policies and procedures. Promptly notify (within 24 hours) Favorite Healthcare Staffing, Inc. by written documentation of any unexpected incidents, errors and sentinel events that involve THPs and of any occupational safety hazards or events that involve THPs.

4. Recognize Favorite Healthcare Staffing, Inc.' policy regarding the floating of staff whereby THPs are instructed not to accept a floating assignment if they do not have the skills required to perform a competent level of care.

5. Assist Favorite Healthcare Staffing, Inc. with the periodic evaluation (no less than annually) of THP job performance. Travelers will be evaluated after each assignment.

6. If applicable, when advanced practice services are requested (NPs and/or PAs), it is the responsibility of the CLIENT to have an executed copy of the Collaborative Agreement between the advanced practice personnel and the collaborating physician.

7. Promptly notify (within 24 hours) Favorite Healthcare Staffing, Inc. by written documentation of any unsatisfactory job performance or action taken to terminate the services of a THP due to incompetence, negligence, or misconduct. In such event the client shall only be obligated to compensate Favorite Healthcare Staffing, Inc. for actual time worked by the THP.

8. If unable to resolve a problem or complaint at the branch or department level, please refer to our Client Grievance Policy located on our website at www.favoritestaffing.com for instructions on how to submit a grievance to Favorite or to report concerns to The Joint Commission. Client may submit a grievance in writing to the corporate office by mail or by email to clientcomments@favoritestaffing.com or by calling our corporate office Human Resources/Quality Assurance Director at 800-676-3456.

9. Provide at least two hours notice of any cancellation of assignment or accept responsibility for payment of two hours of service at the applicable rate for Per Diem shifts. Travelers should not be cancelled unless rescheduled within the same week. Minimum billing once THP has started to work a four (4) hour or greater assignment is 4 hours.

10. Timely and accurately approve THP's time via Favorite's Timecard Mobile App. THP will provide the shift information via mobile phone to the Client and Client will review, approve and sign on the THP's mobile phone. Once a THP's timecard has been approved it will be submitted to Favorite Healthcare electronically and an email confirmation will be sent to the Supervisor if they choose to receive one. Weekly invoices will include a copy of the Supervisor's signature along with the approval details for each shift. A copy of our Timecard Mobile App Instructions can be found on our website at www.favoritestaffing.com for Client's convenience and reference. If the Client requires the THP to provide additional information such as nursing notes, narratives, etc., the Client approval acknowledges the receipt of such additional information.

11. Remit payment for services directly to Favorite Healthcare Staffing, Inc. upon receipt of invoice, **no later than 30 days**. In the event the client questions any amounts invoiced, an explanation of any items in question must be received by Favorite Healthcare Staffing, Inc.' Accounts Receivable department within 15 days. This notification must be made by one of the following means:

    By telephone:  (800) 676 – 3456
    By fax:        866-291-1511
    By e-mail:     accountsreceivable@favoritestaffing.com

    By U.S. mail to:
    Favorite Healthcare Staffing, Inc.
    Attn.: Accounts Receivable
    7255 W. 98th Terr., Suite 150
    Overland Park, KS 66212

12. Pay interest equal to annual maximum allowable by state law, plus cost and disbursements, including reasonable attorney and/or collection fees, incurred in the collection of the client's account in the event client fails to remit payment within 30 days from the invoice date.

13. To help offset the additional administrative and compliance costs attributable to the Affordable Care Act, an ACA surcharge will be applied at a minimal cost of $0.35 per hour for the total hours billed on each invoice as a separate line item for the services we provide to your facility. This minimal cost is to cover the expenses of compliance and avoid any concerns by our clients that they may be liable under co-employment laws. We are committed to being fully compliant with ACA to give our clients peace of mind. We feel the surcharge will make for ease of implementation with the least amount of complication. Our goal is that the surcharge will have minimal impact on your facility.





Joint Commission Health Care
Staffing Services Certification

## STANDARD TERMS AND CONDITIONS OF SERVICE

### The Roles/Responsibilities of Client Cont'd:

14. **Flipping.** During the term of this Agreement, if, and to the extent that, any THP whose profile is submitted by Favorite to Client and is working at Client's facility for Favorite, Client agrees that it will not, and will cause its affiliates not to, interfere with the business of Favorite by inducing that candidate to become employed by any other party at Client's facility (e.g. no "flipping").

15. Client will not hire a per diem or travel THP from Favorite 12 months from their last worked shift at Client facility. If the 12-month period is not honored, Favorite will invoice for a conversion fee based on the Temp-to-Perm conversion fee schedule.

**These terms shall apply unless this right is specifically protected in accordance with state and/or local law.** (In accordance with the MN Statute 144A.72 Favorite will not, in any MN contract, with any MN employee or MN health care facility, require the payment of liquidated damages, employment fees, or other compensation should the employee be hired as a permanent employee of a health care facility. The following Direct Hire/Temp to Perm terms will apply for all allied personnel and/or personnel not providing "direct patient care"; excluding clinical RNs, LPNs, and CNAs in the State of Minnesota)

### THE FOLLOWING POLICY AND FEE SCHEDULE SHALL APPLY TO DIRECT HIRE PLACEMENTS:

The direct hire fee shall be equal to the following percent of the candidate's first year's annualized salary for any candidate presented to Client by Favorite who accepts a position with any clinic, group, healthcare facility or organization owned, operated, or affiliated with Client whether or not in Client's actual local community. Salary amount will be listed on the employment letter for the candidate. In the event Favorite submits a candidate that has been in Client's database, but has not been contacted by Client within 45 days, the candidate is considered eligible to be presented through Favorite.

| Position Level | Job Specification | Direct Hire Fees |
|---|---|---|
| Staff Position | Registered Nurse, Licensed Practical Nurse, Certified Nursing Assistant, Case Manager, Charge RN, Health Informatics | 18% |
| Mid-Level | Nurse Practitioner, Physician Assistant, Department Manager/Director | 20% |
| Executive Level | Director of Nursing, VP Operations and C-Level Healthcare Personnel | 25% |
| Physicians | | $20,000 |

**A. Client agrees to make payment to Favorite in the following manner:**
   i. Client will be invoiced upon confirmation of placement for each candidate.
   ii. Full payment of the direct hire fee will be due to Favorite upon receipt of the invoice date.

**B. Direct Hire Guarantee:**
The Direct Hire Guarantee will apply if payment is received within ten (10) days of the date on the invoice. In the unlikely event that the client is unsatisfied with a candidate provided by Favorite prior to completion of ninety (90) days of the start date the client may choose to end the candidate's employment. Favorite will work with Client to replace the candidate, or Client will be issued a credit on a replacement as follows:

| | |
|---|---|
| 0 – 30 days | 75% credit |
| 31 – 60 days | 50% credit |
| 61 – 90 days | 25% credit |

   i. No replacement will be offered in the event of layoff, a substantial change in the original job description, or elimination of the position.
   ii. Credits may be used immediately or within twelve (12) months beginning at the termination date. A credit may be used for the original candidate search; any deviation from this will need to be approved in advance by Favorite.
   iii. Client will not directly hire a candidate from Favorite or another staffing agency for 12 months from when Favorite initially presented the candidate for hire. If the 12-month period is not honored, the full Direct Hire Fee's associated above shall apply.
   iv. If applicable, and if/when advanced practice services are requested (NPs and/or PAs), it is the responsibility of the CLIENT to have an executed copy of the Collaborative Agreement between the advanced practice personnel and the collaborating physician.

**C. Temp-to-Perm Option:**
A Temp-to-Perm position will include a temporary hourly bill rate and a reduced permanent placement (conversion) fee upon the successful completion of the temporary portion of the assignment based on the fee schedule as shown below. Full payment of the placement fee and invoices for services prior to conversion are due within 30 days of the Temporary Healthcare Professional's start date as an 'employee' of the client. These terms shall apply unless this right is specifically protected in accordance with state and/or local law.

| Hours Worked at Facility Through Favorite: | | Permanent Placement Fee: |
|---|---|---|
| 0-249 | = | 100% of Direct Hire Fee |
| 250-579 | = | 75% of Direct Hire Fee |
| 580-1079 | = | 50% of Direct Hire Fee |
| 1080+ | = | 25% of Direct Hire Fee |





Joint Commission Health Care
Staffing Services Certification

## Joint Commission

The Joint Commission standards under which Favorite is certified relate to quality and safety of care issues as impacted by Favorite's temporary healthcare professionals. Anyone believing that he or she has pertinent and valid concerns about such matters should report these to the management of Favorite Healthcare Staffing either at the branch office or the corporate office (please see our web site at www.favoritestaffing.com for contact information). If the concerns cannot be resolved through Favorite, the individual is encouraged to contact The Joint Commission.

Phone:      800-994-6610

E-Mail:     patientsafetyreport@jointcommission.org

Fax:        630-792-5636

Mail:       Office of Quality and Patient Safety
            The Joint Commission
            One Renaissance Boulevard
            Oakbrook Terrace, IL 60181

Online:     www.jcintcommission.org





Joint Commission Health Care
Staffing Services Certification

STANDARD HIRING PRACTICES

**1. THE FOLLOWING DOCUMENTATION COLLECTED AND RETAINED IN THE PERSONNEL FILE FOR ALL PERSONNEL:**

A. <u>Picture Identification</u>: A photo I.D. from a reliable source.

B. <u>Pre-Employment Screening</u>: All applicants are subjected to a 10-panel drug screen and otherwise tested in accordance with applicable regulatory requirements.

C. <u>Criminal Background Investigation</u>: Employees are checked in a manner compliant with the requirements of Client and always in accordance with government regulations.

D. <u>I-9</u>: Documentation and verification upon Pre-employment

E. <u>Education</u>: Documentation of Education associated with profession/class. (Accepted if it is documented on the application)

F. <u>Work History</u>: Documentation of work history associated with profession/class or as required by client.  (Accepted if it is documented on the application)

G. <u>References</u>: At least two satisfactory written or verbal references verifying work performance in applicable clinical areas.

**2. THE FOLLOWING DOCUMENTATION COLLECTED AND RETAINED IN THE PERSONNEL FILE FOR CLINICAL PERSONNEL:**

A. <u>License Verification</u>: Primary Source On-Line Verification of the employee's license/certification verified with the state, unless the state does not offer verification.

B. <u>Certifications</u>: C.P.R. card and/or other certifications (ACLS, PALS, etc.) as required by policy and client requirements.

C. <u>Skills Inventory</u>: A comprehensive skills inventory appropriate to job classification and age-specific self-assessment.

D. <u>OIG/GSA</u>: Automatically checked on all new hires and then approximately every 1-3 months thereafter.

E. <u>Annual Training and Orientation</u>: Evidence of a yearly review of Fire & Safety, Infection Prevention, Hazardous Waste, Joint Commission Patient Safety Goals and OSHA and HIPAA Privacy and Security standards.

F. <u>Health and TB Test</u>:  Pre-employment health self-assessment.  Upon hire, TB within the past year/or TB questionnaire and current clear chest x-ray.  Other specific health requirements as directed by client or state health guidelines.  Each applicant must have received the Hepatitis B vaccination series or have provided a declination.

G. <u>Testing</u>: Documentation of applicants' competency tests for most clinical staffing areas.  A passing grade of 80 percent or better must be obtained.  Certain specialty areas and paraprofessional testing may be replaced with client interview or other evaluation.

**3. INTERVIEW, PLACEMENT AND ORIENTATION:**

A. Prospective employees are interviewed by the branch director or designee.  During the interview, emphasis is placed upon work history and clinical expertise.

B. Information is provided to applicants regarding performance requirements, Favorite's policies and procedures and, in many cases, specific policies and procedures of client institutions.

C. The assignment of employees is made with consideration for the skills and expertise of the employee, the needs of the client and ultimately the client's acceptance of the suitability of the employee to perform the duties of the assignment.

D. Favorite Healthcare Staffing, Inc. assists its client institutions, as requested, with implementation of their orientation policies and procedures.

# EXHIBIT "C"

**Favorite Healthcare Staffing, LLC**
9800 Metcalf Avenue
4th Floor
Overland Park, KS 66212

# STATEMENT

| Statement Date |
|---|
| 04/18/2023 |

| CUSTOMER ID |
|---|
| FAVORITE-24269 |

| Bill To | |
|---|---|
| **IASIS Healthcare Holdings, Inc.** | |
| 555 N 18th Street, Ste 100 | |
| Phoenix, AZ 85006 | |
| United States of America | |

Page    1    of    2

| Remit-To |
|---|
| **Favorite Healthcare Staffing, LLC** |
| 9800 Metcalf Avenue |
| 4th Floor |
| Overland Park, KS 66212 |
| United States of America |

We appreciate doing business with you.

## OPEN ITEMS

| Currency | Total Balance |
|---|---|
| USD | 372,816.45 |

| Date | Type | Invoice Number | Description | Due Date | Invoice Amount | Amount Due | Balance |
|---|---|---|---|---|---|---|---|
| 12/17/2021 | Adjustment | CINV-02020 | Related Invoice:Favorite-1328919, Memo:Mountain Vista Medical Center 632000 | 12/17/2021 | 16.70 | 16.70 | 16.70 |
| 12/24/2021 | Invoice | Favorite-1334301 | Tempe St. Luke's Hospital 631700 | 01/23/2022 | 8,757.50 | 8,757.50 | 8,774.20 |
| 12/24/2021 | Invoice | Favorite-1334302 | Mountain Vista Medical Center 632000 | 01/23/2022 | 17,931.25 | 17,931.25 | 26,705.45 |
| 12/24/2021 | Invoice | Favorite-1334312 | Tempe St Lukes Hospital 701600 | 01/23/2022 | 5,035.50 | 5,035.50 | 31,740.95 |
| 12/24/2021 | Invoice | Favorite-1334316 | Mountain Vista Medical Center 736900 | 01/23/2022 | 19,560.00 | 19,560.00 | 51,300.95 |
| 12/31/2021 | Invoice | Favorite-1336072 | Tempe St. Luke's Hospital 631700 | 01/30/2022 | 5,696.25 | 5,696.25 | 56,997.20 |
| 12/31/2021 | Invoice | Favorite-1336073 | Mountain Vista Medical Center 632000 | 01/30/2022 | 19,180.00 | 19,180.00 | 76,177.20 |
| 12/31/2021 | Invoice | Favorite-1336081 | Tempe St Lukes Hospital 701600 | 01/30/2022 | 6,741.25 | 6,741.25 | 82,918.45 |
| 12/31/2021 | Invoice | Favorite-1336077 | Florence Tuscan 649100 | 01/30/2022 | 1,440.00 | 1,440.00 | 84,358.45 |
| 12/31/2021 | Invoice | Favorite-1336084 | Mountain Vista Medical Center 736900 | 01/30/2022 | 16,280.00 | 16,280.00 | 100,638.45 |
| 01/07/2022 | Invoice | Favorite-1337797 | Florence Tuscan 649100 | 02/06/2022 | 1,920.00 | 1,920.00 | 102,558.45 |
| 01/07/2022 | Invoice | Favorite-1337792 | Tempe St. Luke's Hospital 631700 | 02/06/2022 | 5,700.00 | 5,700.00 | 108,258.45 |
| 01/07/2022 | Invoice | Favorite-1337793 | Mountain Vista Medical Center 632000 | 02/06/2022 | 19,692.50 | 19,692.50 | 127,950.95 |
| 01/07/2022 | Invoice | Favorite-1337800 | Tempe St Lukes Hospital 701600 | 02/06/2022 | 9,821.25 | 9,821.25 | 137,772.20 |
| 01/07/2022 | Invoice | Favorite-1337803 | Mountain Vista Medical Center 736900 | 02/06/2022 | 14,052.50 | 14,052.50 | 151,824.70 |
| 01/14/2022 | Invoice | Favorite-1339471 | Tempe St. Luke's Hospital 631700 | 02/13/2022 | 5,967.50 | 5,967.50 | 157,792.20 |
| 01/14/2022 | Invoice | Favorite-1339472 | Mountain Vista Medical Center 632000 | 02/13/2022 | 10,092.50 | 10,092.50 | 167,884.70 |
| 01/14/2022 | Invoice | Favorite-1339481 | Tempe St Lukes Hospital 701600 | 02/13/2022 | 9,821.25 | 9,821.25 | 177,705.95 |
| 01/14/2022 | Invoice | Favorite-1339485 | Mountain Vista Medical Center 736900 | 02/13/2022 | 15,579.50 | 15,579.50 | 193,285.45 |

| | Statement Date |
|---|---|
| | 04/18/2023 |
| | Customer ID |
| | Favorite-24269 |

## OPEN ITEMS

| Date | Type | Invoice Number | Description | Due Date | Invoice Amount | Amount Due | Balance |
|---|---|---|---|---|---|---|---|
| 01/21/2022 | Invoice | Favorite-13412 71 | Mountain Vista Medical Center 632000 | 01/21/2022 | 12,540.00 | 12,540.00 | 205,825.45 |
| 01/21/2022 | Invoice | Favorite-13412 70 | Tempe St. Luke's Hospital 631700 | 02/20/2022 | 1,898.75 | 1,898.75 | 207,724.20 |
| 01/21/2022 | Invoice | Favorite-13412 84 | Mountain Vista Medical Center 736900 | 02/20/2022 | 16,592.50 | 16,592.50 | 224,316.70 |
| 01/21/2022 | Invoice | Favorite-13412 81 | Tempe St Lukes Hospital 701600 | 02/20/2022 | 3,341.25 | 3,341.25 | 227,657.95 |
| 01/28/2022 | Invoice | Favorite-13431 01 | Mountain Vista Medical Center 632000 | 02/27/2022 | 8,638.75 | 8,638.75 | 236,296.70 |
| 01/28/2022 | Invoice | Favorite-13431 12 | Tempe St Lukes Hospital 701600 | 02/27/2022 | 11,487.25 | 11,487.25 | 247,783.95 |
| 01/28/2022 | Invoice | Favorite-13431 00 | Tempe St. Luke's Hospital 631700 | 02/27/2022 | 3,836.25 | 3,836.25 | 251,620.20 |
| 01/28/2022 | Invoice | Favorite-13431 13 | Mountain Vista Medical Center 736900 | 02/27/2022 | 15,836.25 | 15,836.25 | 267,456.45 |
| 02/04/2022 | Invoice | Favorite-13449 56 | Tempe St. Luke's Hospital 631700 | 03/06/2022 | 5,657.50 | 5,657.50 | 273,113.95 |
| 02/04/2022 | Invoice | Favorite-13449 57 | Mountain Vista Medical Center 632000 | 03/06/2022 | 13,706.25 | 13,706.25 | 286,820.20 |
| 02/04/2022 | Invoice | Favorite-13449 67 | Tempe St Lukes Hospital 701600 | 03/06/2022 | 9,112.50 | 9,112.50 | 295,932.70 |
| 02/04/2022 | Invoice | Favorite-13449 69 | Mountain Vista Medical Center 736900 | 03/06/2022 | 11,718.75 | 11,718.75 | 307,651.45 |
| 02/11/2022 | Invoice | Favorite-13468 38 | Mountain Vista Medical Center 632000 | 03/13/2022 | 9,786.25 | 9,786.25 | 317,437.70 |
| 02/11/2022 | Invoice | Favorite-13468 37 | Tempe St. Luke's Hospital 631700 | 03/13/2022 | 7,561.25 | 7,561.25 | 324,998.95 |
| 02/11/2022 | Invoice | Favorite-13468 51 | Tempe St Lukes Hospital 701600 | 03/13/2022 | 6,513.75 | 6,513.75 | 331,512.70 |
| 02/11/2022 | Invoice | Favorite-13468 53 | Mountain Vista Medical Center 736900 | 03/13/2022 | 10,613.75 | 10,613.75 | 342,126.45 |
| 02/18/2022 | Invoice | Favorite-13487 23 | Tempe St. Luke's Hospital 631700 | 03/20/2022 | 4,936.25 | 4,936.25 | 347,062.70 |
| 02/18/2022 | Invoice | Favorite-13487 24 | Mountain Vista Medical Center 632000 | 03/20/2022 | 8,288.75 | 8,288.75 | 355,351.45 |
| 02/18/2022 | Invoice | Favorite-13487 35 | Tempe St Lukes Hospital 701600 | 03/20/2022 | 4,826.25 | 4,826.25 | 360,177.70 |
| 02/18/2022 | Invoice | Favorite-13487 36 | Mountain Vista Medical Center 736900 | 03/20/2022 | 12,638.75 | 12,638.75 | 372,816.45 |